**Mary Jeanne ROSE, Plaintiff-Appellant,**

v.

**BRIDGEPORT BRASS COMPANY et al.,
Defendants-Appellees.**

No. 72–1196.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1973.

Decided Oct. 26, 1973.

Norman P. Metzger, Ronald Elberger, Indianapolis, Ind., for plaintiff-appellant.

Michael R. Maine, Charles L. Whistler, Keith C. Reese, Indianapolis, Ind., Carl Frankel, Pittsburgh, Pa., Michael H. Gottesman, Washington, D. C., for defendants-appellees.

Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

Mary Jeanne Rose filed in the district court a complaint against Bridgeport Brass Company, the United Steel Workers of America, and Local 4266 of the same union. Citing provisions of Title VII of the Civil Rights Act of 1964,[1] and of a collective bargaining agreement entered into by the Company and the Local, Rose sought damages for and injunctive relief from sex discrimination allegedly practiced to her detriment by the Company. An additional claim was that the defendant labor organizations had not, as to her, fulfilled their mutual duty of fair representation. After the defendants had filed motions to dismiss, and after the district judge had elected under Rule 12(b) of the Federal Rules of Civil Procedure to treat these as summary judgment motions, summary judgment was entered against Rose on all facets of her complaint. The propriety of this summary judgment is what Rose questions on appeal.

I

In her complaint, Rose sets out the following facts: On or about October 15, 1969, Rose held the job classification of blanking press operator within Department 359 of the company. On that date, due to illness and an order from her doctor, she was granted an authorized leave of absence from her employment. Over a year later, on October 28, 1970, Rose sought to return to work, having obtained on that date a work release from the Company doctor for light duty involving the physical lifting of no more than forty pounds. The Company informed her that no jobs were available anywhere in the plant. Two days later, the Company laid off some forty-seven employees of Department 359 on the basis of their junior plantwide seniority. More senior employees from other departments were awarded the jobs thereby vacated. At least two of the vacancies in Department 359 were given to employees of the male sex despite the fact that they were lower on the plantwide seniority ladder than Rose. She made no attempt to secure these positions, having been told by the Director of Industrial Relations, Robert Stultz, that the Company viewed her to be an "inactive employee" without a right to the open jobs.

The complaint goes on to state that the award to less senior men of jobs created by the October 30 layoff was sexual discrimination in violation of law and contract. Rose complains, too, that she would have been permitted to return to her job as a blanking press operator on October 28, had not the Company, sometime during the interim of her sick leave, redefined the job classification of blanking press operator to include what had formerly been the tasks of both a blanking press operator and a blanking press helper. The new job required a worker capable of lifting eighty pounds, far more than Rose was allowed to lift by the terms of her work release. The reclassification, according to Rose, was undertaken by the Company "willfully and intentionally to make it physically impossible for her and other members of the female sex to perform the tasks required under the new job classification," again, a violation of contract and statute by the Company. In support of the claim, the complaint reveals that Department 359 had in 1969 approximately thirty female employees out of an approximate total workforce of seventy-five; of these women, at least twenty-three had been blanking press operators. In October of 1970, by contrast, the Department employed twelve women out of

1. 42 U.S.C. § 2000e–2, subsections (a) and (c).

a contingent of forty, two of whom were blanking press operators.[2] Finally, Rose complains of the failure of the Company under the collective bargaining contract to allow her on October 28 to displace the least senior employee in the plant from some job other than blanking press operator.

The complaints made about the Union and the Local are these: Rose filed grievances through the Local according to procedures established under Article 19 of the collective bargaining agreement, which set up a five-step sequence for the processing of grievances. The third step was reached on November 17, and the fourth on December 16, two days after Rose had filed a complaint against the Company, the Union and the Local with the Equal Employment Opportunity Commission which alleged, in part, that Rose had not "been fairly repersented [sic] in good faith by the Union." At the conclusion of unsuccessful discussions at the fourth stage of the grievance machinery, a representative of the Union stated that he would not take the grievance to the fifth step—namely binding arbitration—because he did not personally believe that Rose had been the victim of discrimination by the Company. When, on January 5, 1971, Rose suggested to the president of the Local that the Union was not behind her, he replied: "That's right!"

Rose, on January 13, 1971, went on to file an affidavit with the National Labor Relations Board, accusing the Company and the labor organizations of sex discrimination in violation of section 8 of the National Labor Relations Act. Rose also complained to the Indiana Civil Rights Commission on February 3, 1971. Neither plea resulted in any agency action, however; the Regional Director of the NLRB felt that evidence of discrimination was not sufficient to justify his issuance of a complaint, and the Indiana agency declined jurisdiction. Rose subsequently was informed on March 24, 1971 that an arbitration of her grievance was to take place on April 2, 1971. At that proceeding, the representatives of the labor organizations did not raise the issue of sex discrimination though, Rose states, "that was the basis of her grievance filed on November 2, 1970." The complaint concludes that these events show that the Union and the Local had "not used their best offices and efforts to resolve plaintiff's grievance based on sex discrimination contrary to Article 19 and Article 3, Section 1 of the collective bargaining agreement" and 42 U.S.C. § 2000e–2(c).

In response to the complaint, the Company filed a motion to dismiss for lack of jurisdiction of the subject matter because, in part, Rose had elected and been denied relief through arbitration before filing her complaint. Attached to the motion was an affidavit executed by Robert Stultz, which included as an exhibit a written decision of the arbitrator who heard and rejected the contractual grievance of Rose which the Union and the Local had finally taken to arbitration. According to Stultz, Department 359 had been closed down in January 1970; its personnel were either reassigned to jobs in other departments or were placed on layoff status. Those employees on layoff were recalled to work in other departments strictly on the basis of their plantwide, not departmental, seniority. Department 359 was reopened on a limited basis in May 1970, with a complement of sixteen employees chosen on the basis of their plantwide seniority. When Rose applied for work as a blanking press operator on October 28, 1970, she, according to Stultz, was denied the position (1) because she was not physically qualified for the job, and (2) because her plantwide seniority did not entitle her thereto. Rose was again denied a job on October 30—after a general layoff at the plant which required a reassignment of jobs to the most senior employees—because the company felt

---

2. This is brought out in a later affidavit. The complaint itself states that the Department employed ten woman of forty employees, none of whom were press operators.

that an employee on leave of absence, like Rose, was not contractually entitled to receive a reassigned job following a layoff.

The arbitration decision attached to the Stultz affidavit reveals that the arbitrator was fully in agreement with the position of the Company as to the events of October 30. With respect to Rose's earlier attempt to regain her job as a press operator, the arbitrator found:

> In Section 3 of Article 18 the only specific reemployment right of returnees from sick leave within one year is to be restored to the jobs "they occupied immediately prior to their absence . . . if appropriate and they are otherwise qualified." In the instant case this contractual option was unavailable (1) because the job had been shutdown on January 16, 1970, and (2) Mrs. Rose was no longer qualified to perform the work because of the weight-lifting restriction.[3]

The arbitrator likewise found that Rose was not entitled to some other job on October 28:

> Since the specific contract provision is inapplicable, we must turn next to the past practice of the parties. The parties have developed a practice based in part at least upon the language of the last sentence of the first paragraph of Section 3 of Article 18. It was agreed at the hearing that if the returnee from sick leave is unable to return to his or her former job, he or she is permitted to bid upon a posted job or to take an open job which in either event he or she is qualified to perform. In the present case no job was posted when Mrs. Rose sought to return to work on October 23, 1970.

Neither was there an open job on that date. Accordingly, on that date her status continued as an employee on sick leave.

The Company relied in large part upon the contractual interpretations of the arbitrator in its motion to dismiss. Citing United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), and the rest of the *Steelworkers* trilogy,[4] it argued that the arbitrator's findings were binding upon Rose, and that, without a contractual right to the jobs she sought, Rose could not have been discriminated against.

The Union and the Local, too, filed a motion to dismiss. They apparently adopted the affidavits of the Company, for their motion, sans affidavits, mirrors that of the Company. The only contention made therein which has the slightest pertinence to Rose's charge of inadequate representation by reason of sex discrimination was that the same charge had been made and pursued by Rose to a decision against her before the general counsel of the NLRB.

On November 12, 1971, approximately five months after Rose filed her complaint, the district judge ruled that the pending motions to dismiss were, in effect, motions for summary judgment, and ordered the parties to submit further evidence in support of their motions. Rose filed a cross-motion for summary judgment, supported by an affidavit, on December 13, 1971.

On January 6, 1972, the district court denied the cross-motion and entered a summary judgment for all defendants, evidently on the ground that arbitration had disposed of Rose's claim in its entirety. This appeal followed.

---

3. The first of these reasons does not correspond to the position taken by Stultz that Rose was refused the job of blanking press operator because of her lack of plantwide seniority. The affidavit of Stultz, in fact, contradicts the arbitrator's justification, for Stultz makes it clear that the job of blanking press operator was in operative existence when Rose applied for it on October 28.

4. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

## II

It is apparent on the face of the summary judgment entry that the district judge may have misconceived his function.

Its concluding passages state:

> The plaintiff has not maintained the burden of proof of all of the essential elements of the complaint and the alleged facts thereof by a preponderance of the evidence.
>
> \* \* \*
>
> The plaintiff has failed to prove that the defendants discriminated against the plaintiff because of her sex in the Labor Agreement in issue or in the administering of such contract.

Rose, however, did not carry a burden of proof on the motions of the defendants for summary judgment. In ruling on a motion for summary judgment, a district court is charged by Rule 56 of the Federal Rules of Civil Procedure with determining whether or not the "pleadings, . . . together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our cases have uniformly placed upon the movant for summary judgment the burden of establishing the absence of a genuine issue of material fact. Carter v. Williams, 361 F.2d 189, 193 (7th Cir. 1966); Motoux v. Gulling Auto Electric, Inc., 295 F.2d 573, 576 (7th Cir. 1961). The burden is not lightly discharged.

"On a motion for a summary judgment the burden of establishing the nonexistence of any genuine issue of fact is upon the moving party, *all doubts are resolved against him,* and his supporting affidavits and depositions, if any, are carefully scrutinized by the court." Albert Dickinson Co. v. Mellos Peanut Co.,

179 F.2d 265, 268 (7th Cir. 1950), citing Walling v. Fairmont Creamery Co., 139 F.2d 318, 322 (8th Cir. 1943) (emphasis added). With these principles in mind, we turn to examine the pleadings and affidavits upon which summary judgment was granted below.

We read Rose's complaint to state four claims, three against the Company and one against the Union and the Local. Rose accuses the Company of violating her seniority rights on October 28 by not allowing her to displace the least senior employee in the plant, of discriminating against her as a woman on October 28 by refusing to reinstate her to her former job as a press operator by reason of a weight restriction on that job which was instituted for a discriminatory purpose, and of violating her seniority rights on October 30 by refusing to give her a job opened up by a plantwide layoff. The first claim is based, apparently, on Rose's rights under the collective bargaining agreement; the second and third make reference to both the contract and 42 U.S.C. §§ 2000e–2(a)(1) and (2). The claim against the labor organizations is that they failed to employ their best efforts to aid her in redressing these actions of the Company, thereby violating their contract with the Company and 42 U.S. C. §§ 2000e–2(c)(1) and (2).

The Company would have us uphold summary judgment as to Rose's claim of a discriminatory job reclassification on the ground that an affidavit executed by Stultz and presented in opposition to Rose's cross-motion for summary judgment makes clear beyond contradiction that the sole reason of the Company for having realigned the duties of a blanking press operator was the promotion of economy.[5] According to Stultz, the Company was having difficulty in early 1970 in bidding competitively on government contracts for brass cups, the prod-

5. The Company does not argue that Rose would not have been entitled to the job of blanking press operator on October 28 even if it had not reclassified the job. Nor could it, at least on its motion for summary judg-

ment, for Stultz and the arbitrator do not agree as to what the other reason might be. See note 3, *supra,* and 6 J. Moore, Federal Practice 2170 n. 28 (1971).

uct of Department 359. The job of a blanking press operator was reclassified to reduce the number of employees necessary to run the operation by twenty-five to thirty percent, thus making operation more economical.

■ Is it true, as the Company argues, that Rose "failed to make an issue on a single one of these facts"? App. Br. at 16. We think not. Her complaint and her affidavit in support of her cross-motion for summary judgment reveal that twenty of thirty-six positions of press operator in Department 359 were held by women when, on October 15, 1969, Rose began her authorized leave of absence. At that time the Department employed 75 workers. When Rose sought reinstatement in October, 1970 the Department, to her knowledge, had a complement of forty employees, twelve of whom were females. Of these, however, only two held jobs as press operators. Assuming that the total number of press operator positions remained proportionately the same as it had been a year before,[6] it is apparent that the ratio of female press operators to the total number thereof dropped markedly from .555 [7] to .104 [8] during the course of the year. This surely raises the possibility that the job reclassification had a discriminatory effect.[9]

Furthermore, Rose called into question the economic motivations of the Company in her affidavit:

> Prior to the job reclassification and reopening of Department 359, one (1) Blanking Press Helper was employed to assist every two (2) Blanking Press Operators. The Helper's job included lifting and dumping tubs full of "cups" or bullet casings which weigh approximately 80 pounds and putting the metal with the press.

> After the job reclassification, the helpers were reduced in number to one (1) for every four (4) presses and the press operators undertook the function previously carried out by the helpers of dumping the tubs. To do so required the operator to leave his post and walk around the machine to check the tub and, when necessary, to empty it.

> When I began work as a press operator, I was told never to leave my position in front of the press while it was operating because a defect in the metal could cause a breaking of the machine. Operators, who are now required to leave the machine regularly, *either leave it operating and thus risk a breakdown or turn it off and thus temporarily halt production.*

> I cannot say of my personal knowledge whether or not this arrangement has contributed to greater cost economy and increased efficiency of operation. Information as to increased efficiency is within the control of the Bridgeport Brass Co. (emphasis supplied).

Given these allegations—which at least impugn the justification of the Company —we would be loath to hold that no doubt exists as to whether the job reclassification was motivated purely by economic considerations. The summary judgment on this portion of the complaint is accordingly reversed.

The other two claims of Rose against the Company bear no uncertainty as to any material fact. Both were submitted

---

6. An assumption which favors the Company to some extent, for the complement of blanking press helpers had been reduced in number by the job reclassification.

7. 20 ÷ 36.

8. 2 ÷ (36(40 —75)).

9. Rose also notes that thirty out of the 1969 complement of Department 359 were women, while only twelve were employed therein in 1970, a ten percent drop from forty to thirty percent. This is a much less significant shift in female complement than that revealed by concentrating solely on the press operator position, but we do not find it as relevant as the latter figure, for it may be that the other positions held by women were less fulfilling in wages than the press operator position or were less desirable in some other fashion cognizable under 42 U.S.C. §§ 2000e–2(a)(1) and (2).

to an arbitrator and decided adversely to Rose. On October 28, the arbitrator later found, Rose had no contractual right to displace an active employee of the company. The arbitrator also found that Rose, on October 30, continued in the status of an employee on sick leave despite the layoffs that occurred on that date, and that the jobs opened by the layoffs were not open to her. The Company insists that these determinations are binding on Rose and that she cannot now reassert what are essentially the same claims by casting them as violations of her civil rights prohibited by Title VII of the Civil Rights Act of 1964. Rose argues in opposition that her current claims of sex discrimination are different from the grievances she put before the arbitrator. Alternatively, she appears to argue by citation of Hutchings v. United States Industries, Inc., 428 F.2d 303 (5th Cir. 1970), that the arbitral award should not preclude her Title VII suit even if the issues she now raises are identical to the ones which the arbitrator ruled upon. We reject her views.

■ Rose has made no Title VII claim relating to the general failure of the Company to reinstate her on October 28. After setting forth the discriminatory reclassification of her former job by the Company and her resultant failure to regain that position, the complaint of Rose states:

> She was not allowed by the defendant Bridgeport Brass Co., however, to exercise . . . her seniority rights to displace the last senior employee in the plant as . . . required under the Article 18, Section 3 of the collective bargaining agreement.

We are cited no authority which supports the view that Rose may in a federal court relitigate contractual claims which she made before and had decided by an arbitrator; the trial judge was right to grant the Company a summary judgment on this aspect of the case. Rose, however, did complain that the inaction of the Company on October 30

was a Title VII violation, and we must reach the merits of her legal argument on that claim.

■ The factual basis for the claim is exactly the same as the foundation of the analogous contractual claim made to the arbitrator, namely, that male employees with less seniority than her were given jobs on October 30. The arbitrator ruled that Rose, whether more senior or not, had no right to the jobs. It is possible to accept this proposition and assert, nonetheless, that Rose may have been subject to discrimination by the Company? We think not. The Company would have violated the collective bargaining agreement had it given Rose a job on October 30, and it would have done so at the expense of another employee. If what the Company did was required by the contract, and if the contract itself is not discriminatory, the Company could not have discriminated against Rose no matter what its subjective motivation.

■ As is thus apparent, Rose must be found to have a right to challenge the contractual ruling of the arbitrator if she is to succeed on her claim of discrimination. This she cannot do. It has been settled beyond peradventure that a federal court may not upset the findings of a labor arbitrator insofar as they involve interpretations of a collective bargaining agreement. To allow a contractual claimant who has lost at arbitration an opportunity to relabel his claims to state civil rights violations and secure their readjudication this time in a federal court, is to erect a deterrent to arbitration by employers in clear contravention of national labor policy. The cases which Rose cites do not persuade us to take an opposite view. Rios v. Reynolds Metals Co., 467 F.2d 54 (5th Cir. 1972), is fully in agreement with our position, for the Fifth Circuit there recognized a limited power in a district court to defer to an arbitral award where, among other things, "the contractual right coincides with rights under Title VII . . . , [and] the factual

issues before [the district court] are identical to those decided by the arbitrator." 467 F.2d at 58.[10] See also Nuest v. Westinghouse Air Brake Co., 313 F. Supp. 1228, 1234 (S.D.Ill.1970); Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1223–28 (1971); cf. Page v. Curtiss-Wright Corp., 332 F.Supp. 1060, 1067–1068 (D.N.J.1971). Nor is Hutchings v. United States Industries, Inc., 428 F.2d 303 (5th Cir. 1970), an authority to the contrary. As the Rios court recognized, 467 F.2d at 55, Hutchings was a case where "the rights and remedies at issue in the grievance or arbitration proceeding and the rights and remedies at issue in the Title VII case differ[ed]." 428 F.2d at 314 n. 10.[11] Finally, we conclude that our decision in Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969), is inapposite,[12] for the pertinent holding of that case was

10. Rios also required as a condition to deferral that the district court find that "the arbitration proceeding was fair and regular and free of procedural infirmities." 467 F. 2d at 58. Rose argues that this condition was not met by the arbitration at issue, since "the Union did not present all of Rose's case to the arbitrator." Accepting, arguendo, the Rios requirement, we cannot agree that it went unfulfilled. The crucial passage of Rose's complaint is this: "During the arbitration hearing, no representatives of the defendant labor organizations raised the issue of sex discrimination although that was the basis of her grievance filed on November 2, 1971."

Her own exhibits, however, belie this statement. The grievance form which Rose submitted on November 2, 1970, filed as Exhibit E to her complaint, made no mention of sex discrimination in connection with her deprivation of contractual seniority rights. The only claim of sex discrimination was this:

Nature and contents of contract is discriminatory in its referral to men, beginning with Art. 2, 3rd paragraph, and continuing through Art. 21, Sec. 2.

All of her other complaints fall under the heading "Contract violation." If, moreover, she had complained to the labor organizations that the contractual violations of the Company constituted sex discrimination, those organizations could not have erred by pressing, first, the issue of whether the Company had violated the contract, for a finding for the Company on that point would remove the foundation for the discrimination claim. The defendant labor organizations, moreover, did not err in failing to argue that the Company's reading of the contract, if correct, was nonetheless sexually discriminatory as to Rose, for Rose clearly did not complain to them that the reinstatement provisions of the contract were discriminatory on their face or as applied in violation of Article 3, Section 1 of the contract.

11. In Hutchings, an employee and his union had taken to arbitration a grievance that the employer had, in violation of contract, abolished a position to which the employee would otherwise have been entitled. The arbitrator determined that the employer had justifiably eliminated the job in view of a "sharp reduction of work load and work force" in the department in which the employee worked. Hutchings v. U. S. Industries, Inc., 309 F.Supp. 691, 692 (E.D.Tex. 1969). A contractual claim of racial discrimination was not pressed before the arbitrator, and his decision indicates that considerations of racial animus did not enter into his assessment of the employer's motivation.

In Hutchings, then, the arbitrator's finding that the employer was not required by its labor contract to keep the disputed job open did not necessitate a conclusion that the employee could not have been discriminated against. If the employer would have kept the job open for a white employee, a Title VII violation existed without reference to the contract. Here, however, the Company was required by its contract to give jobs created by layoff to employees other than Rose, and—absent a discriminatory contract—the Company could not have discriminated by conforming to its agreement with Rose's representatives.

Hutchings also involved a second incident of employee-management conflict, one which had been resolved without going to arbitration. Not only was it doubtful that a claim of racial discrimination had been resolved in the grievance process, there was, further, no possibility of deferral to an arbitrator's decision, a situation which fails to call into play the national labor policy expressed in the Steelworkers trilogy. See Parmer v. National Cash Register Co., 346 F.Supp. 1043, 1049 n. 5 (S.D.Ohio 1972).

12. A conclusion which disposes, too, of Rose's reliance on Parmer v. National Cash Register Co., 346 F.Supp. 1043 (S.D.Ohio 1972), a case which relied on Bowe for the propositions that an employee need not elect one or the other of his dual remedies under Title VII and arbitration, and that the collective bargaining process need not be exhausted before a Title VII suit is brought.

that an employee need not forego an arbitration of his contractual grievances to obtain redress in a federal court for violations of Title VII based on the same acts which formed or would form the factual predicate for the contractual grievances. We noted in *Bowe* that different remedies were available to a federal court and to an arbitrator.

> While we recognize that there is a burden placed on the defendant who must defend in two different fora, we also note that there may be crucial differences between the two processes and the remedy afforded by each. . . . [A]s with unfair labor practice cases, in a case involving an alleged breach of a contract brought before an arbitrator, the arbitrator may consider himself bound to apply the contract and not give the types of remedy which are available under the statute. Conversely, an action in court may not be able to delve into all the ramifications of the contract nor afford some types of relief available through arbitration, *e.g.*, back pay prior to the date of the statute. 416 F.2d at 715.[13]

We do not deviate from *Bowe* by the decision we have made today. Had Rose won at arbitration, we would not have held her barred from bringing the instant suit, provided, of course, that relief beyond that awarded by the arbitrator was sought.[14]

The summary judgment on the second and third claims or Rose against the Company is accordingly affirmed.

### III

■ The crux of the claim which Rose makes against the Union and the Local is not that they failed to press her claims of sex discrimination,[15] but that they were reticent to press her contrac-

tual claims and might not have taken them to arbitration had she not filed discrimination claims with the EEOC and the NLRB. Since the claim is essentially one of discriminatory reticence —being based on either or both 42 U.S. C. § 2000e–2(c) and the doctrine of fair representation espoused in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L. Ed.2d 842 (1967)—proof of it would entail a showing that the Union and the Local would have moved more quickly to arbitration had Rose been a man. On a review of the record, we conclude that Rose failed to adduce facts on this essential point.

After Rose had filed her complaint against the Union and the Local with the NLRB, that agency conducted an investigation. It concluded:

> The charge that the Union has discriminately failed to process the Charging Parties' grievance is completely rebutted by the fact that it has processed and is currently processing their only recently filed grievance to arbitration. To the extent that charging parties claim the Union is acting in bad faith, they have not adduced a scintilla of evidence in support thereof. Exhibit K to complaint.

Rose made no response by affidavit to this finding, and her complaint holds not even an assertion that a man would have received better treatment than she by the defendant labor organizations. As to the Union and the Local, the summary judgment is accordingly affirmed.

The judgment is affirmed in part and reversed in part.

STEVENS, Circuit Judge (dissenting in part).

Although it is unfortunate that the district court incorrectly characterized the deficiencies in plaintiff's case as a

---

13. No "crucial differences" exist in this case between the arbitral and district court processes. That the arbitrator found the facts correctly is undisputed, and the fact that he was not an Article III judge is not a difference we deem crucial.

14. We do not decide whether, in this event, the Company would be bound in the district court by the findings of the arbitrator.

15. *See* note 10, *supra*.

failure to maintain the burden of proof by a preponderance of the evidence—a characterization plainly inappropriate for disposition of a summary judgment motion—I am nevertheless persuaded that his ruling was correct. I join in Judge Swygert's analysis of the contract claims and the claims against the Union. However, with respect to the statutory claim of sex discrimination by the company, I do not agree that any issue of fact requiring a trial has been raised.

Three different factors have combined to produce the effect which plaintiff asserts is illegal. First, the task of lifting brass cups produced by the blanking press requires sufficient strength to handle a weight of 80 pounds. Plaintiff is not physically qualified to do that work. Thus, this is not a situation comparable to the rule in Bowe v. Colgate-Palmolive Company, 416 F.2d 711 (7th Cir. 1969), which excluded *all* females from a particular job category because *some* could not do the work. A rule which limits eligibility for a job to persons physically qualified to perform the work is not discriminatory even if fewer members of one sex have the requisite physical characteristics.

Second, at a time when plaintiff was absent on sick leave, the defendant terminated the operation of Department 359. The uncontradicted evidence indicates that the reason for this action was economic; the work being done in that department was then unprofitable. Plaintiff has adduced no evidence tending to prove that the closing was motivated by a discriminatory purpose.

Third, while plaintiff was still on leave, the department was reactivated with a smaller work force. Instead of using one helper for every two press operators, the new arrangement required only one helper for four presses because the operator was assigned the responsibility for removing the heavy brass cups. In consequence, the number of employees in the department was significantly reduced. As a result of the reassignment of a portion of the helper's duties to the operators, the operator was required either to stop the machine occasionally or to leave the normal operating position briefly to handle the heavy brass cups. The change therefore involved some slight increase in the risk of an operating breakdown, but it is undisputed that the change effected significant savings in the cost of operating the department.[1]

The three factors discussed so far include no evidence that any of the actions taken by the company were motivated by an intent to discriminate against the plaintiff or against female employees. Support for the discrimination charge is predicated entirely on the fact that the operating changes resulted in a change in the relative number of females employed in the department and employed as blanking press operators.

Unquestionably, statistical or demographic evidence often provides persuasive and reliable evidence of illegal discrimination. It may raise a reasonable inference of subjective bias, or it may prove that a non-job related requirement has a discriminatory effect which is illegal even if it was unintended. *Cf.* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. In this case, however, neither inference is reasonable nor, indeed, in my opinion, permissible. There is no dispute about the fact that the operating changes did produce economies, the fact that physical strength is related to job performance, or the fact that there are relatively fewer females than males with the physical strength required for this particular job. I am therefore not persuaded that this record contains any evidence supporting an acceptable inference of sex discrimination.

---

[1]. The portions of plaintiff's affidavit which are read to "impugn the justification of the company" merely indicate that the management decision to effect a significant cost reduction involved a minimal increase in the risk of an operating breakdown. A management decision to accept that risk as the price of reducing costs does not constitute evidence of sex discrimination.

In sum, I agree that a non-random distribution of jobs between males and females may raise an inference of discrimination. But if the record contains an uncontradicted credible explanation of business factors which naturally produce such a non-random distribution, I do not see how those predictable consequences can properly be accepted as evidence of a secret discriminatory motive. For if this statistical evidence is sufficient, then logically any ratio other than 50–50 may require a jury trial of a claim alleged by a member of the disfavored sex.[2]

I therefore respectfully dissent insofar as the summary judgment entered by the district court is reversed.

---

2. In this case the majority relies on plaintiff's affidavit, as well as the numerical evidence, but as I have explained in note 1, *supra*, I find nothing in the affidavit supporting either an inference of sex discrimination or inference that the company's explanation for the changes was contrived.