**CITY OF WEST CHICAGO, a municipal corporation, Plaintiff,**

v.

**UNITED STATES NUCLEAR REGULA-TORY COMMISSION and William J. Dircks, Defendants.**

No. 82 C 842.

United States District Court, N. D. Illinois, E. D.

Sept. 22, 1982.

Harold J. Spelman & Associates by Penney L. Fillmer, West Chicago, Ill., for plaintiff.

Dan K. Webb, U. S. Atty., Gail C. Ginsberg, Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

HUBERT L. WILL, District Judge.

This is an action under the Freedom of Information Act (FOIA) brought by plaintiff City of West Chicago (West Chicago) pursuant to 5 U.S.C. § 552(a)(4)(B) (1977), seeking disclosure of an Environmental Impact Statement (EIS) covering the proposed "decommissioning" of a Kerr-McGee manufacturing facility in West Chicago and of documents pertaining to that EIS in the possession of the defendant Nuclear Regulatory Commission (NRC). The matter is now before the Court on defendants' motion for summary judgment. For the reasons which follow, the defendants' motion is granted in part and denied in part and the defendants are ordered to submit to this Court for in camera inspection the sections numbered 1, 4 and 7 of the third preliminary version of the Draft EIS covering the proposed decommissioning. The defendants are also ordered to submit an authenticated copy of the final version of the Draft EIS to assist the Court's in camera inspection.

The controversy involved here began with a request dated November 12, 1981 on behalf of West Chicago for disclosure of all documents and other materials available from the NRC relating to the EIS covering the decommissioning of the Kerr-McGee manufacturing facility in West Chicago. For a number of years, the Kerr-McGee facility had been used for milling and manufacturing operations involving thorium, a radioactive element. As a result of years of such operations, equipment, buildings and residual materials at the facility are contaminated with thorium, a radioactive element. They must now be "decommissioned," that is, dismantled and disposed of, a process over which the NRC has regulatory authority.

Pursuant to this authority, the NRC, in November 1978, ordered Kerr-McGee to produce a full decommissioning plan for the facility. That plan was commented upon by the State of Illinois, the Environmental Protection Agency and West Chicago. As a result, the NRC requested a revised plan, which was submitted in August 1979. The NRC then apparently concluded that the proposed decommissioning was a "major federal [action] significantly affecting the quality of the human environment" and decided to arrange for work to begin on the preparation of the EIS that the National Environmental Policy Act (NEPA) requires in such cases. See 42 U.S.C. § 4332(2)(C) (1977). The NRC's announcement of intent to prepare an EIS in connection with the project was published in the Federal Register late in 1979. 44 Fed.Reg. 72,246 (1979).

According to the affidavit, dated May 7, 1982, of William A. Nixon, a Senior Chemical Engineer employed by the NRC and the Project Manager for the Kerr-McGee Decommissioning Project (Nixon Affidavit or the affidavit), the NRC submitted a proposal to the Department of Energy (DOE) requesting a DOE contractor, the Argonne National Laboratory (Argonne), to provide technical assistance to the NRC staff in the development of an environmental analysis of the project. Argonne submitted its work product directly to the NRC for assessment and review.

The EIS, which the NEPA requires to be prepared for all "major federal actions" that "significantly [affect] the quality of the human environment" is a document prepared for public scrutiny. Rather detailed regulations of the Council on Environmental Quality (CEQ) outline the procedure for development of a Draft EIS in appropriate cases, submission of the Draft EIS to the public and to other federal and state agencies and entities for comment, and, last, for preparation of a Final EIS incorporating or rejecting the comments received. *See* 40 C.F.R. §§ 1502.9, 1503 (1981). The documents that Argonne was involved in preparing and which are in issue in this lawsuit have been described as "preliminary versions" or "drafts" of the Draft EIS (Nixon Affidavit, ¶ 4). This characterization is uncontroverted.

According to the Nixon affidavit, these preliminary versions of the Draft EIS were submitted by Argonne to the NRC for review and criticism between December 1980 and December 1981. There were three such preliminary versions in all;[1] each one was unsatisfactory to the NRC and each was returned to Argonne together with criticisms and recommended modifications.

The plaintiff's FOIA request was filed on November 12, 1981, prior to the release of the Draft EIS, which was then still in preparation. The request sought copies of all documents and other materials relating to the EIS. No completed Final EIS or Draft EIS was in existence at the time of this request, and an employee of the NRC orally informed the plaintiff that no documents would be released pursuant to this request. Plaintiff then filed a written appeal from this initial denial. The appeal was in turn denied in a letter directed to plaintiff's attorney, dated December 21, 1981. The letter emphasized that numerous records relating to the Kerr-McGee project had already been released to West Chicago in connection with related FOIA requests of that city. It noted that the NRC would comply with the disclosure and comment requirements of NEPA and that West Chicago would have the opportunity to comment on Argonne's final product in the form of a Draft EIS. The denial letter claimed that the materials requested were exempt from the disclosure requirements of the FOIA by virtue of an Exemption in that statute.

The Nixon affidavit, referred to above, is a fairly detailed document that describes both the process of preparation of the Draft EIS and, in rather cursory fashion, the content of each of the eight sections and five appendices of the third preliminary version of the Draft EIS. The Nixon affidavit is the only submission in this case that provides any hint of the contents of the disput-

---

**1.** There is some confusion between the parties over which of these preliminary versions is in issue on this motion. West Chicago's FOIA request to the NRC and its complaint in this Court concerned "documents pertaining to the [Kerr-McGee project] EIS." (Complaint, ¶¶ 8, A) Unaccountably, the NRC has assumed that only the third preliminary version of the Draft EIS is in issue in its motion for summary judgment. (Defendants' Memo, p. 4) Thus, the NRC's affidavit and argument are directed exclusively to establishing that the final preliminary draft is exempt from FOIA disclosure. West Chicago asks us to rule today on the status of all three preliminary versions. (Plaintiff's Memo, p. 4 n. 1)

Because the NRC's summary judgment motion is limited to the third preliminary version of the Draft EIS, our ruling today is correspondingly limited. We surmise that much, if not all, of what we say today would apply equally to the earlier drafts of the Draft EIS. Unless the parties are able to agree between themselves on the basis of what we say today on the status of the earlier drafts, it will be necessary for us, on proper motion, to rule separately on the propriety of withholding the two earlier draft versions of the Draft EIS.

ed document. The portion of the Nixon affidavit that describes the document is reproduced here in its entirety:

9. Th[e] third draft of the Draft EIS consists of 329 pages. It is divided into eight sections and contains five appendices.

10. Section 1 of the third draft contains a ten-page summary description of the Kerr-McGee site in West Chicago and a brief discussion of the six proposed decommissioning alternatives that were under consideration. Section 1 also includes a brief analysis of the environmental impacts involved in each alternative as well as any restraints that exist for the implementation of any of the proposed alternatives. Finally, this section contains a short explanation of the NRC staff's preferred choice (in December 1981) among the six alternatives and a description of the licensing and other regulatory activities necessary to carry out that alternative.

11. Section 2 of the third draft contains a two-page summary history of the Rare Earth Facility and of the development of the decommissioning plan, which is derived from information already in the public record.

12. Section 3 of the third draft is twenty-seven pages long and contains a more detailed analysis of the six proposed decommissioning alternatives being considered and the costs and problems associated with each of the proposals.

13. Section 4 of the third draft is a 161-page detailed description of the West Chicago site and the proposed alternative disposal sites. The descriptions include discussions of the pertinent details of each disposal site's topography, climate, demography and social profile, historical and archaeological resources, water resources, flora and fauna, and the existing radiation environment.

14. Section 5 of the third draft is a seventy-nine page description of the environmental impacts at each of the proposed alternative sites in terms of air quality, topography, socio-economic and political concerns, land resources, histori-cal and archaeological resources, water resources, flora and fauna, and radiation health. It also discusses proposed methods of mitigating undesirable impacts, where applicable, and sets forth any irreversible and irretrievable commitments of resources for each of the alternatives.

15. Section 6 of the third draft is an eight-page delineation of the environmental effects of potential accidents, both radiological and nonradiological, that could be considered unique to any of the decommissioning alternatives. Also discussed are safety measures to prevent such potential accidents or minimize their impacts.

16. Section 7 of the third draft is an eight-page description of the monitoring programs that are now in existence, or may need to be instituted, with regard to each of the proposed alternatives.

17. Section 8 of the third draft is a one-page list of those who contributed to its preparation.

18. Attached to the third draft are five appendices, totalling thirty-three pages in length, that compile data relating to various aspects of the proposed decommissioning alternatives, including the methodology of site selection and surveys of the physical environment at the Kerr-McGee facility and the alternative sites.

(Nixon Affidavit, ¶¶ 9–18)

The affidavit goes on to predict that the preliminary document it describes will be superseded by a final Draft EIS on the Kerr-McGee project, which will be open to public scrutiny in accordance with the provisions of NEPA and the regulations promulgated thereunder. Subsequent to the filing of this lawsuit, in May 1982, the NRC indeed released for public comment a Draft EIS covering the decommissioning project.

The FOIA is a broad disclosure statute that requires publication of certain rules and policies of the federal agencies, *see* 5 U.S.C. § 552(a)(1) (1977), and disclosure, on request, of other records, *see* 5 U.S.C. § 552(a)(2) and (3) (1977). Subsection (a)(3) provides:

Except with respect to records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any) and procedures to be followed, shall make the records promptly available to any person.

A total of nine "Exemptions" to this broad disclosure rule are contained in 5 U.S.C. § 552(b) (1977). Exemption 5, the one the parties agree is in issue in this case, provides:

This section does not apply to matters that are—

\* \* \* \* \* \*

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party in litigation with the agency . . . .

5 U.S.C. § 552(b)(5) (1977)

■ The established doctrine is that the Exemptions are to be construed narrowly. *See, e.g., Bristol-Myers Co. v. FTC,* 424 F.2d 935, 938 (D.C.Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). The statute provides that the burden of proof on the applicability of any of the Exemptions to an FOIA request in a *de novo* judicial review of the question is on the agency resisting disclosure. 5 U.S.C. § 552(a)(4)(B) (1977). Moreover, in its motion for summary judgment, the NRC, as moving party, shoulders the burden of establishing the absence of any dispute on any issue of material fact. *See, e.g., Rose v. Bridgeport Brass Co.,* 487 F.2d 804, 808 (7th Cir. 1972). The undisputed rule is that the pleadings and the affidavit on which our decision in this case is to be based[2] are to be construed in favor of West Chicago, the moved-against party. *See ibid.*

**2.** The NRC has also submitted three unauthenticated ·documents styled "exhibits" for our consideration in connection with the parties' dispute over whether the preliminary versions of the Draft EIS submitted by Argonne to the NRC are "inter-" or "intra-" agency documents for purposes of application of a NEPA regula-

Plaintiff opposes this motion for summary judgment initially on the theory that the CEQ regulations promulgated under NEPA make Exemption 5 inapplicable to the facts of this case. Plaintiff's argument is that § 1506.6(f) of the CEQ regulations, 40 C.F.R. § 1506.6(f) (1981), overrides the general protection from disclosure provided to agencies by Exemption 5. That section of the CEQ regulations provides in part:

Agencies shall:

\* \* \* \* \* \*

(f) Make environmental impact statements, the comments received and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda *where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action.* [Emphasis added.]

Plaintiff notes that the preliminary versions of the Draft EIS were prepared by Argonne and that Argonne is a contractor of DOE. Since Argonne is a DOE facility, the argument runs, any of its submissions to the NRC are "interagency memoranda." Moreover, since the submissions in question are draft versions of an EIS, they are "memoranda" which "transmit comments of [a] Federal agenc[y] on the environmental impact" of an agency project. Thus, plaintiff concludes, the regulation requires disclosure of all of these submissions without regard to so much of Exemption 5 as protects "interagency memorandums" from disclosure under the circumstances specified in the Exemption.

However, the construction of the regulation for which plaintiff is arguing would ·amount to an implausible repeal by agency regulation of a broad federal statute. If plaintiff's proposed construction of the reg-

tion, 40 C.F.R. § 1506.6(f) (1981), alleged by West Chicago to be in issue in this case. Since, as we explain, our view is that § 1506.6(f) of the CEQ regulations does not have the force that West Chicago contends it has, we have no occasion to consider the factual dispute to which the exhibits are relevant.

ulation were adopted, the result would be that any agency, such as the defendant in this case, that employed another agency as an outside contractor to prepare an EIS would be required to disclose all memoranda pertaining to the project without the benefit of Exemption 5. If, on the other hand, the agency prepared the EIS in-house or retained a private outside contractor, it would be free to seek the protection of Exemption 5 for unpublished drafts of the EIS. Plaintiff points to no policy or purpose of NEPA, pursuant to which these regulations were promulgated, that would be furthered by the reading it advocates. Indeed, we can conceive of none.

 That section of the regulation is intended to insure that the comments of federal agencies on EIS's that have been submitted to them for comment, as provided for by 42 U.S.C. § 4332(2)(C) (1977), not be shielded from disclosure by misplaced reliance on Exemption 5. Such comments on Draft EIS's are to be provided in accordance with the provisions of another section of the CEA regulations. *See* 40 C.F.R. § 1503 (1981). We think it clear that the section on which plaintiff relies merely insures that these agency comments are "made available ... to the public." See 42 U.S.C. § 4332(2)(C) (1977). The term "comments" in the portion of § 1506.6(f) quoted and underscored above refers only to comments provided by other federal agencies as provided in § 1503.

Despite our doubt that the point requires further elaboration, we note that the history of § 1506.6(f) supports the view we have taken of its meaning. The immediate predecessor of § 1506.6(f) was § 1500.11(d) of the CEQ Guidelines on preparation of EIS's, 40 C.F.R. § 1500.11(d) (1978), which provided in part:

The agency responsible for the environmental statement is also responsible for making the statement, the comments received and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion of intra- or interagency memoranda when such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action pursuant to § 1500.9 of these guidelines.

Section 1500.9, referred to in the quoted passage, was the section of the Guidelines which set out the procedure for review of Draft EIS's by federal agencies. Thus, the prior provision was unambiguously limited in application to the comments of federal agencies reviewing Draft EIS's.

The preamble to the current CEQ regulations contained a single paragraph on § 1506.6(f) which is reproduced here in full:

As proposed, subsection (f) of this section required Federal agencies to make comments on environmental impact statements available to the public. This subsection repeated the existing language on the subject that has been in the Guidelines since 1973 (40 CFR 1500.11(d)) relative to the public availability of comments. On the basis of comments received, the Council altered this provision to state that intra-agency documents need not be made available when the Freedom of Information Act allows them to be withheld.

43 Fed.Reg. 55,978, 55,987 (1979). Since the old Guideline was revised only to *protect,* pursuant to Exemption 5, documents that had previously been subject to disclosure under that Guideline, we are satisfied that the current regulation should not be read to mandate disclosures beyond those required by the former Guidelines, inconsistent with Exemption 5 and unauthorized in any event by the provisions of the NEPA.

Having determined that the CEQ regulations do not make Exemption 5 of the FOIA inapplicable to this case, we now turn to the important issue raised by this summary judgment motion: whether the NRC has discharged its burden of demonstrating that the withheld documents "would not be available by law to a party other than an agency in litigation with the agency," and, thus are entitled to be withheld from disclosure in plaintiff's FOIA request.

The obscure language of Exemption 5, quoted above, has been the subject of considerable litigation. The Supreme Court first considered the scope and application of the Exemption in *EPA v. Mink,* 410 U.S. 73, 85–94, 93 S.Ct. 827, 835–39, 35 L.Ed.2d 119 (1973), a lawsuit brought by members of Congress to obtain disclosure from an executive committee of material concerning a proposed underground nuclear test. The Court there recognized that Exemption 5 shields "materials reflecting deliberative or policy-making processes," by its incorporation into the FOIA of the so-called "deliberative process privilege" available to agencies in the context of civil discovery. *Ibid.* Those documents that precede an agency's decision in a matter and which "reflect the agency's group thinking in the process of working out its policy" are thus exempt from FOIA disclosure. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 153, 95 S.Ct. 1504, 1517, 44 L.Ed.2d 29 (1975).

The leading District of Columbia circuit cases on Exemption 5, *see Jordan v. United States Department of Justice,* 591 F.2d 753, 772–73 (D.C.Cir.1978); *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980), and the scholarly literature on the subject, *e.g.,* Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 797 (1967), discuss several policy bases that underlie the deliberative process component of Exemption 5. The most fundamental of these—which had been identified by the Senate Committee that recommended passage of the FOIA, *see* H.Rep.No. 1497, 89th Cong., 2d Sess. 10 (1966), *reprinted in* 1966 U.S.Code Cong. & Ad.News 2418, 2427—appears to be the concern that the quality of agency decision making would be compromised by the inhibiting effect on agency personnel from exposure to public criticism of their tentative recommendations and suggestions.

That policy concern applies to draft versions of documents ultimately destined for release to the public: presumably the agency employees or outside contractors charged with preparation of such documents would feel unduly constricted in their tasks, and would produce inferior work, if forced to produce while swimming in a "fishbowl"— as it is frequently styled—of public scrutiny. Creative or unorthodox ideas that might have been put forward in draft versions of documents, could be stifled if their authors knew that the documents would be subject to public view. Further, public confusion could result if ideas that were purely personal to the authors of draft documents were mistaken for the official position of the agency. Because of this need to protect the integrity of the decision-making process, several recent cases have held that draft versions of various agency documents were exempted from FOIA disclosure by Exemption 5. *See King v. Internal Revenue Service,* 684 F.2d 517 at 520 (7th Cir. 1982) (draft of IRS technical memorandum); *Russell v. Department of the Air Force,* 682 F.2d 1045, 1048–49 (D.C.Cir.1982) (draft of Air Force official history of use of Agent Orange in Vietnam); *Arthur Andersen & Co. v. Internal Revenue Service,* 679 F.2d 254 at 259 (D.C.Cir.1982) (draft of IRS Revenue Ruling).

The third preliminary version of the Draft EIS falls logically within the Exemption 5 protection for unpublished draft versions of documents that will later be published as an official agency position. The Nixon affidavit describes in moderate detail the process of give and take by which the analysis contained in several preliminary versions of the Draft EIS was honed to the point where it would be satisfactory for public release. Early versions of the Draft EIS—based, it is said, on occasion, on inaccurate or unverified versions of the facts— were conveyed to the NRC, which in turn conveyed to Argonne critical comments contained, at times, in marginal notations. According to the Nixon affidavit, "th[is] process of review and modification is essential to the development of an acceptable environmental appraisal" (Nixon Affidavit, ¶ 8), a conclusion which the plaintiff does not contravene.

The NRC thus appears to have discharged its burden of showing that the third preliminary version of the Draft EIS

was an integral component in the deliberative process of preparing the form Draft for release. To the extent the preliminary version of the Draft EIS is "deliberative in nature"—that is, to the extent it does not contain segregable, "purely factual" material—it is protected from FOIA disclosure by Exemption 5.

Plaintiff counsels us to "examine carefully the defendant's refusal to disclose the document" "in light of the public nature of the EIS for which the withheld document was drafted." (Plaintiff's Memo at 9) Apparently, plaintiff's position is that this Court should subject agency efforts to withhold documents related to the production of EIS's to particularly exacting review because of the Congressional policy, reflected in the NEPA, of public participation in the review of federal agency actions that significantly affect the environment.

 Plaintiff does not suggest, however, that defendants have in any respect failed to live up to the procedural demands of the NEPA or the CEQ regulations. Early on in this project, the Kerr-McGee decommissioning proposal was submitted to the public for comment. After the decision to prepare an EIS was made, proper notice thereof was published in the Federal Register. Subsequent to the filing of this lawsuit, a Draft EIS was completed and made available for comment by various officials as contemplated by the NEPA and the regulations. We fail to understand why, in this case, the disclosures that defendants have made in accordance with the NEPA should, of themselves, weaken the case for withholding underlying documents, which no one contends the NEPA requires be disclosed. Accordingly, we do not believe that defendants' Exemption 5 claim should be subjected to heightened scrutiny because the withheld documents underlie compliance with the NEPA.[3]

Determining that the draft documents in issue here are generally of the sort that Exemption 5 was designed to protect, however, does not end our inquiry. The Supreme Court, in *EPA v. Mink,* recognized that portions of documents to which Exemption 5 applies must nevertheless be disclosed if those portions contain "purely factual material" that may be severed from its context "without compromising the private remainder of the documents." 410 U.S. at 91, 93 S.Ct. at 837–38. We do not believe that the NRC has demonstrated that certain sections of the disputed document in this case contain no segregable, "purely factual" material.

The Nixon affidavit indicates that unspecified portions of the third preliminary Draft EIS contain unverified facts. (Nixon Affidavit, ¶ 19). If the intention of this assertion is to suggest that the public must be shielded from inaccurate factual suppositions made by the agency, then we think the affidavit is misguided. We understand the purpose of the FOIA to be to expose agency decisions to public view. Exemption 5 was not intended as a shield to spare agencies the embarrassment of being exposed as having gotten their facts wrong. To the extent that the Nixon affidavit implies that the public should be spared the "confusion" that would result from revelation of inaccurate factual assumptions by the NRC, we find the document condescending and at odds with the spirit of the FOIA. *See* H.Rep.No. 1497, 89th Cong., 2d Sess. 6 (1966), *reprinted in* 1966 U.S.Code Cong. & Ad.News 2418, 2423.

The NRC also suggests that "[r]elease of factual portions of draft documents would, through disclosure of the underlying context and manner in which they are selected and emphasized, reveal the essence of the ongoing deliberative process." (Defendants's Memo at 11 n. 4) The concern was elaborated by Judge Friendly in *Lead In-*

---

**3.** Further, the fact that the documents in question were prepared for the NRC by an outside consultant of the agency rather than by NRC personnel is irrelevant to their status in applying Exemption 5. *See, e.g., Soucie v. David,* 448 F.2d 1067, 1078 n. 44 (D.C.Cir.1971); *Wu*

*v. National Endowment for the Humanities,* 460 F.2d 1030, 1032 (5th Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1352, 35 L.Ed.2d 586 (1973); *Lead Industries Ass'n v. Occupational Health and Safety Administration,* 610 F.2d 70, 83 (2d Cir. 1979).

dustries Association v. Occupational Safety and Health Administration, 610 F.2d 70, 82–88 (2d Cir. 1979), who held that the mere process of summarization of facts gleaned from a massive testimonial record was a deliberative exercise. 610 F.2d at 86. Such factual summaries either appeared on the public record as a part of the final reports in issue in that case (and, thus, did not need to be disclosed) or were altered prior to the final document, in which case their revelation would amount to disclosure of the deliberative process leading up to the final reports. *Ibid; accord Russell v. Department of the Air Force,* 682 F.2d at 1049.

The Nixon affidavit appears to suggest, in conclusory fashion, that the identical situation is present here: "release of a yet-unfinished staff technical document would inhibit the NRC staff and its contractors from engaging in such exchanges of critical comments because of concerns that such predecisional comments, *as reflected by changes in the preliminary documents,* would be subject to challenge." (Nixon Affidavit, ¶ 19; emphasis added) We think the broad, implicit suggestion of the NRC in this case that revelation of the facts contained in early versions of the Draft EIS would reveal the "essence of the deliberative process" may prove too much. Unless the NRC can provide some context for its conclusory suggestion that the deliberative process will be revealed through disclosure of factual portions of the preliminary documents, the effect of their argument would be to make all factual portions of preliminary documents immune from disclosure in contravention of the contemplation of the Supreme Court in *EPA v. Mink* and the terms of the statute, 5 U.S.C. § 552(a)(4)(B), providing for partial disclosure of documents.[4]

■ An unquestioned principle of FOIA litigation is that "conclusory and generalized allegations of exemptions" do not suffice to shield agency documents from FOIA disclosure. *Vaughn v. Rosen,* 484 F.2d 820, 826 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *see also, e.g., Parke, Davis & Co. v. Califano,* 623 F.2d 1, 6 (6th Cir. 1980); *Mead Data Central, Inc. v. Department of the Air Force,* 566 F.2d 242, 261 (D.C.Cir.1977). Bearing this principle in mind, we move to a closer examination of the individual sections of the disputed document.

■ The Nixon affidavit describes, in several paragraphs quoted previously, eight sections of the preliminary version of the Draft EIS. Four of these eight, sections 2, 3, 5 and 6, are shown by this description to be privileged and immune from disclosure. The Nixon affidavit, the good faith of which we have no reason to question, states that section 2 is an historical summary derived from information already in the public record. The process of summarization is deliberative. *See Lead Industries Association,* 610 F.2d at 86. Material already on the public record need not be disclosed. *Ibid.* Sections 3, 5 and 6 as described in the affidavit are wholly deliberative in nature. Section 3 is a cost benefit analysis of the decommissioning alternatives. Section 5 is an analysis of the probable environmental impacts of disposal at the alternative sites. Section 6 describes the possible environmental effects of potential accidents. Facts may be repeated or summarized in these analytical sections of the preliminary version of the Draft EIS. We are not obliged, however, to comb through these portions of the document in search of small bits of material, not already available to the public, which is "purely factual." *See Lead Industries Association,* 610 F.2d at 86–88.

**4.** The *Lead Industries* case presented a somewhat different problem. The technical facts summarized in the preliminary versions of the reports at issue there were contained in an already-made record of testimony. The reports there thus redacted and isolated what were apparently competing versions of technical facts. They did not describe them in the first instance as do the preliminary versions of the

EIS in this case. *See* 610 F.2d at 80. In *Russell v. Department of the Air Force,* the conclusion that the facts contained in a 20-page section of a draft history of an Air Force program—much of which had already been disclosed—could not be disclosed without revealing the deliberative process of the Department, was reached only after in camera inspection of the disputed section. 682 F.2d at 1049.

In light of the policies of Exemption 5 discussed above and the description of these sections contained in the Nixon affidavit, we conclude that the NRC has discharged its burden of proving that Exemption 5 protects them from disclosure.

■ Section 8 of the contested document consists of a list of the contributors to the third preliminary draft. This list is also exempt from disclosure. Here, the reasoning of Judge Friendly in *Lead Industries*, adverted to previously, is entirely pertinent: if the names are in the final Draft, they are already on the public record and need not be disclosed; if they are not in the final version, then their disclosure would infringe the basic policy of Exemption 5 that the predecisional work of individuals within government agencies be carried out free of publicity and the concomitant need to justify in public their tentative opinions and conclusions.

■ As described in the Nixon affidavit, however, sections 1, 4 and 7 contain either both factual and deliberative material or, in the case of section 4, solely factual material. Section 1 includes "a ten page summary description of the Kerr-McGee site." Section 4 consists of a "detailed description of the West Chicago site and the proposed alternative sites." And section 7 includes a "description of the monitoring programs that are now in existence." We have no basis on this record for concluding that the factual material in these sections is not segregable from the opinions and analysis the sections may also contain. Nor is there any basis for our concluding that disclosure of this material would necessarily reveal the deliberative process within the agency. Some further proof as to these sections is required. We conclude, not without reluctance, that in camera inspection of sections 1, 4 and 7 of the third draft is necessary.

In *EPA v. Mink*, the Court discussed the mechanics of demonstrating that withheld documents contain no "purely factual" material. The Court noted that in camera inspection would be "necessary and appropriate" "in some situations" but that that procedure "need not be automatic." It then suggested that "detailed affidavits" or "surrounding circumstances" might sufficiently demonstrate the absence of segregable factual material in withheld documents. 410 U.S. at 93, 93 S.Ct. at 838–39.

Soon after *Mink*, the District of Columbia circuit developed the technique of permitting the government to establish its claims to various FOIA exemptions by submitting indices to the district court—now called "*Vaughn v. Rosen* indices"—that correlate the claimed exemptions to specific sections of the withheld document and provide detailed explanations of the reasons for the exemptions' applicability. *See Vaughn v. Rosen*, 484 F.2d at 823–28. Obviously, such indexing is particularly valuable in cases, unlike the one at bar, where more than one exemption is involved and different exemptions are claimed for several portions of the withheld document.

The *Lead Industries* case involved a request for draft reports submitted to OSHA by outside experts analyzing voluminous testimony taken in connection with proposed OSHA rules governing permissible levels of exposure to lead. Judge Friendly, recognizing the general principles of *Mink* outlined above, but sensing the conceptual difficulty of the distinction between "opinion" and "fact" where the "facts" were those selected for discussion from a voluminous record of raw testimony, concluded that the district court should not have conducted in camera inspections to comb the documents for "segregable tidbits" of purely factual material. 610 F.2d at 86, 88. *Accord Weissman v. Central Intelligence Agency*, 565 F.2d 692, 697 (D.C.Cir.1977) (Exemptions 1, 3 and 7). In *Lead Industries* and *Weissman*, the agencies had submitted both detailed *Vaughn v. Rosen* indices and various affidavits supporting the claims to exemption.

The case against in camera inspection as a general matter is a powerful one: the practice involves a substantial commitment of scarce judicial resources and is at odds with our open, adversarial tradition since it necessarily adds only an ex parte decision to the disclosability determination. In partic-

ular, lengthy documents of a technical sort—such as the one at bar—impose on the resources and strain the capacities of the judiciary. *See generally* Comment, In Camera Inspections Under the Freedom of Information Act, 41 U.Chi.L.Rev. 557, 558–61 (1973).

Despite the weightiness of these considerations, we feel that in camera inspection of those portions of the preliminary Draft as to which the NRC has failed to discharge its burden of proof, is appropriate here. The broad, imprecise language of Exemption 5 imposes on the agencies the temptation to hide disclosable material behind vague, general assertions of privilege. Section 4 of the preliminary document is described as 162 pages in length and as consisting entirely of detailed descriptions of six alternative disposal sites; this section—unless it can be established that most of its contents are already on the public record with the release of the Draft EIS—is hardly a "factual tidbit" of the sort involved in *Lead Industries.* Mindful as we are of the limitations on our capacity to decipher technical material, we nonetheless believe that we are capable of drawing the rough line between fact and opinion or analysis that the judiciary is so frequently called upon to establish. Further, we are confident of our ability to determine, on review, whether the NRC's deliberations could be inferred from release of portions of the document.

While the NRC has failed to demonstrate that sections 1, 4 and 7 are protected, it has asserted that their disclosure would amount to a revelation of the deliberative process that preceded the release in May of this year of the Draft EIS. In light of the important policy considerations underlying Exemption 5, we have no wish to set a precedent for perfunctory release of documents for which the Exemption is claimed. The statute calls on us to make a *de novo* determination of the eligibility of the document for disclosure, using in camera inspection, where necessary, in aid of that determination. *See* 5 U.S.C. § 552(a)(4)(B) (1977) Where the NRC's assertion of the Exemption is at odds with its own description of sections 1, 4 and 7 as wholly or largely factual in content, intelligent "review" of the status of these sections is not possible.

We do not see how, other than by our inspection of these portions of the documents together with the already-released Draft EIS, their status under the FOIA may be finally resolved. *Cf. Smith v. Flaherty,* 465 F.Supp. 815, 820, 824 (M.D.Pa. 1978) (ordering additional affidavits to make possible *de novo* review where only claim made on record as to withheld documents was that they were "confidential.")

It is well established that factual material already on the public record need not be disclosed on a FOIA request. *E.g., Lead Industries,* 610 F.2d at 86. The record of this case does not now contain the Draft EIS that was published in May 1982. In light of the legal rule, we will need a properly authenticated copy of that document to assist us in determining what, if any, disclosures must be made in this case.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted with respect to sections 2, 3, 5, 6 and 8 of the third preliminary version of the Draft EIS. The motion is denied as to the remaining sections 1, 4 and 7, and the defendants are ordered to produce those sections of the third preliminary version to this Court for in camera inspection. Defendants will also provide us with a copy of the final Draft EIS which has been released for public comment. An appropriate order will enter.