Oliver MARSHALL, et al.,
Plaintiffs–Appellants,

v.

WESTERN GRAIN COMPANY, INC.,
and The Riverside Group, Inc.,
Defendants–Appellees.

No. 86–7761.

United States Court of Appeals,
Eleventh Circuit.

March 1, 1988.

Rehearing and Rehearing En Banc
Denied April 6, 1988.

Richard Ebbinghouse, Birmingham, Ala., for plaintiffs-appellants.

David J. Middlebrooks, Sirote, Permutt, McDermott, Slepian, Friend, Friedman, Held and Apolinsky, Birmingham, Ala., for defendants-appellees.

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for *the Eleventh Circuit.*

Before FAY, Circuit Judge, HENDERSON\*, Senior Circuit Judge, and BLACK\*\*, District Judge.

PER CURIAM:

The plaintiffs in this action, forty-six former union employees of Western Grain Company, Inc. [hereinafter "Western Grain"], appeal from an order entered by the United States District Court for the Northern district of Alabama dismissing their complaint for failure to state a claim upon which relief may be granted. For the following reasons, the judgment of the district court is affirmed in part, vacated in part and reversed in part.

Western Grain purchased its facility in Birmingham, Alabama from the Jim Dandy Company [hereinafter "Jim Dandy"]. After the sale, Western Grain continued to employ the plaintiffs, who had worked for Jim Dandy at the Birmingham plant. All of the plaintiffs were represented by Local 12830 of the United Steelworkers of America, AFL–CIO–CLC [hereinafter "Union"]. As part of the transaction, Western Grain assumed the collective bargaining agreement between Jim Dandy and the Union. That agreement remained in force through April 9, 1984.

In December 1983, Western Grain announced the shutdown of its operations. All but four union employees were terminated. Following clean-up operations, the remaining four union employees were also laid off. The Riverside Group, Inc. [hereinafter "Riverside"] alleged to be a successor corporation of Western Grain, bought out the company.

Western Grain paid severance pay to its employees who were not covered by the collective bargaining agreement. This group included office clerical employees, millwrights, maintenance and truck mechanics employed in the maintenance de-

\*\* Honorable Susan H. Black, U.S. District Judge for the Middle District of Florida, sitting by designation.

partment, foremen, salesmen, watchmen, office janitors and professional employees, guards and supervisors as defined by the National Labor Relations Act, 29 U.S.C. § 141 et seq. [hereinafter "NLRA"]. They received one week's pay for each year of service performed at the Birmingham facility. Out of the total number of non-union employees, only four were black.

The union employees, on the other hand, did not receive any severance pay.[1] This group included production employees, truck drivers, laborers and plant janitors employed by the company. All but one of the sixty-eight union employees were black.

In October 1984, the plaintiffs filed charges with the Equal Employment Opportunity Commission alleging race discrimination.[2] Following the receipt of right to sue letters, the plaintiffs filed a complaint against Western Grain and Riverside in the United States District Court for the Northern District of Alabama, Southern Division. In Count One, the plaintiffs alleged that the defendants violated § 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.,[3] by paying severance pay to non-union employees but not to union employees. In Count Two, the plaintiffs alleged that the defendants violated § 703(a) of Title VII by perpetuating a policy in which non-union positions were generally not open to black workers. The plaintiffs claimed that this policy was discriminatory because non-union employees received benefits not available to union employees while at the same time receiving all the benefits given to union employees. In Count Three, the plaintiffs alleged that the defendants violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d),[4] when they made severance payments only to non-union employees.

On June 6, 1986, both defendants filed motions to dismiss. On July 29, 1986, the district court granted the defendants' motions. The court granted Western Grain's motion on the basis of insufficiency of service of process. In his order, the trial judge stated that ordinarily he would grant leave to effect service within a specified time but he declined to do so because he believed that the plaintiffs failed to state a claim against either defendant under either Title VII or the Equal Pay Act. Following a denial of their motion to alter or amend the judgment, the plaintiffs filed this appeal.

### I. Count One: Nonpayment of Severance Benefits

To establish a prima facie case of racial discrimination under Title VII, the

---

1. The collective bargaining agreement contained a provision for severance pay for union employees. However, its scope was limited to those bargaining unit employees who had worked for at least three years and only in the event that the hiring of outside contractors caused the elimination of an entire department.

2. They claimed that they were not aware of the facts underlying their complaint until September 1984.

3. Section 703(a) provides as follows:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
   (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employ-

ee, because of such individual's race, color, religion, sex, or national origin.

4. Section 206(d)(1) provides as follows:
   (d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

plaintiffs must show that they are members of a racial minority and that they were treated differently from similarly situated non-minority members. *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir.1985). In employment discrimination cases, the question of whether the plaintiffs are similarly situated with non-minority members is crucial. *See, e.g., Johnson v. Artim Transportation System, Inc.*, 826 F.2d 538 (7th Cir.1987) (upholding district court finding that five white employees with different disciplinary records were not similarly situated with plaintiff); *Kendall v. Block*, 821 F.2d 1142 (5th Cir.1987) (upholding district court finding that white employees with different grade levels and performance ratings were not similarly situated with plaintiff).

The defendants focus on this "similarly situated" requirement in their defense of this appeal. According to the defendants, given the "differences in status created by the presence of the bargaining unit," the plaintiffs would under no circumstances be able to show that they were similarly situated with white, non-union workers with respect to payment of severance benefits. Brief of Defendants/Appellees at 13.[5]

The plaintiffs offer a different perspective in their briefs. According to the plaintiffs, the existence of a collective bargaining agreement is irrelevant to the question of whether the defendants' distribution of severance benefits was discriminatory. In support of this argument, the plaintiffs cite the decision in *Hishon v. King & Spalding*, 467 U.S. 69, 75, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984), where the Supreme Court ruled that "[a] benefit ... may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." *See* Reply Brief for Plaintiffs–Appellants at 2.

Although the *Hishon* decision offers some guidance regarding the employer's obligations under Title VII in distributing privileges of employment, it does not (as the plaintiffs suggest) necessarily preclude

an employer from relying on its contractual rights and responsibilities in refusing to dispense privileges. Although an employer's obligations under Title VII preempt his contractual obligations, the courts do not lightly disregard the employer's contractual obligations. This is especially true in cases such as the present one, where the employer's contractual obligations are governed by the National Labor Relations Act [hereinafter "NLRA"]. Under the NLRA, the employer may not disregard the terms of a collective bargaining agreement in order to make severance benefits payments to his employees. 29 U.S.C. § 158(a)(5). Thus, where the employer's provision of benefits to minority workers is restricted by the terms of a collective bargaining agreement, a balance between the competing policies of Title VII and the NLRA must be struck.

█ Several broad principles may be discerned from the decisional law involving Title VII and the NLRA. One principle is that the NLRA offers no protection to an employer who defends his practices on the basis of a collective bargaining agreement that is discriminatory on its face or in its application. When the collective bargaining agreement is discriminatory, the employer has an affirmative duty under Title VII to modify the agreement to remedy the effects of the discrimination. For example, in *Nottelson v. Smith Steel Workers D.A. L.U. 19806, AFL–CIO*, 643 F.2d 445 (7th Cir.1981), *cert. denied*, 454 U.S. 1046, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981), the plaintiff, a Seventh Day Adventist, alleged that his employer discharged him in violation of Title VII after he refused to financially contribute to his union. The court agreed, holding that although the collective bargaining agreement provided for such financial contributions, the employer nonetheless unreasonably failed to accommodate the plaintiff's religious beliefs by permitting substitute charity donations. In response to the employer's argument that it should be entitled to rely on the provisions of its union shop agreement, the

**5.** Although the terms "union" and "collective bargaining unit" do not ordinarily have identi-

cal meanings, they will be used interchangeably in this opinion for the sake of convenience.

court stated that "[i]t is well settled ... that Title VII rights cannot be bargained away and that a collective bargaining agreement therefore does not of itself provide a defense for Title VII violations." *Id.* at 452. *See also United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir. 1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972), (Title VII overrides collective bargaining agreement where agreement restricts transfer and promotion opportunities of incumbent black employees).

■ Where the collective bargaining agreement is neither discriminatory on its face nor in its application, the policies of Title VII give way to federal labor policies. As a matter of federal labor law, courts will not intervene in the collective bargaining process and require the employer to take steps unauthorized by the duly-negotiated agreement. *See* 29 U.S.C. § 158(a)(5). This principle applies even in cases where the concerns of Title VII are indirectly implicated. *See generally Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (employer has no duty to bargain with minority union members regarding allegedly discriminatory transfer policies).

This refusal to tamper with nondiscriminatory collective bargaining agreements is necessary to promote respect for the collective bargaining process. Thus, courts have declined to intervene even in cases where the plaintiff frames his request for relief in the form of a Title VII complaint. For example, in *Rose v. Bridgeport Brass Co.,* 487 F.2d 804 (7th Cir.1973), the plaintiff claimed that her employer's decision to deny her a job reassignment after plant-wide layoffs, and to instead give jobs to male employees with less seniority, violated Title VII. The Seventh Circuit held that the plaintiff was not entitled to relief under Title VII because she was not contractually entitled to a job reassignment. According to the court,

> The Company would have violated the collective bargaining agreement had it given Rose a job on October 30, and it would have done so at the expense of another employee. If what the Company did was required by the contract, and the contract itself was nondiscriminatory, the Company could not have discriminated against Rose no matter what its subjective motivation.

*Id.* at 810.[6]

In light of the principles set forth above, it is apparent that the collective bargaining agreement in this case should not be set aside based upon the mere allegation that minority workers were treated differently from non-minority workers. Instead, we must determine whether the "discrimination" alleged in Count One of the Complaint is the kind which requires judicial intervention into the collective bargaining process.

At this stage of the litigation, we must accept the plaintiffs' factual allegations as true and are not concerned with whether the plaintiffs will be able to prove them at trial. "In appraising the sufficiency of the complaint ..., the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). As stated earlier, Count One alleges that the defendants, after deciding to close their Birmingham facility in 1983, began laying off predominately-black bargaining unit employees and predominately-white non-bargaining unit employees. After the layoffs, the

**6.** In determining that the plaintiff was not contractually entitled to a reassigned job after the layoff, the court in *Rose* deferred to the ruling of an arbitrator. A subsequent decision of the United States Supreme Court, *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), effectively invalidated this portion of the court's analysis, holding that a Title VII plaintiff who raises issues previously decided by an arbitrator is entitled to a trial de novo regarding those issues. *Alexander* did not, however, disturb the principle set forth in *Rose* which requires judicial nonintervention into nondiscriminatory collective bargaining agreements.

defendants paid severance benefits to each member of the group of non-bargaining unit employees, and withheld such benefits from each member of the bargaining unit.[7] According to the plaintiffs, the defendants' withholding of severance pay from them constituted discrimination based on race and color in violation of Title VII.

What is immediately clear from the face of the Complaint is that the plaintiffs do not seek to prove that the collective bargaining agreement governing their relationship with the defendants was in itself discriminatory. In fact, the one crucial fact which the plaintiffs offer to establish their claim of dissimilar treatment—payment of severance benefits to predominantly-white, non-union members and nonpayment to predominately-black union members—does not challenge the defendants' implementation of the collective bargaining agreement. Thus, the plaintiffs ask this court to recognize a theory of relief heretofore unrecognized in Title VII jurisprudence. As discussed above, federal courts have traditionally provided a remedy to collective bargaining unit members under Title VII when the plaintiffs claim that their employer discriminatorily applied the collective bargaining agreement, or that the agreement was discriminatory on its face. Under the theory set forth by the plaintiffs, the courts are asked to provide a remedy based upon the contention that non-minority, non-union employees were being treated differently from minority, union employees.[8]

■ For several reasons, we conclude that Count One does not state a claim of "discrimination" under Title VII. First and foremost, because of their unique status in the workplace, bargaining unit employees are *never* similarly situated with non-bargaining unit employees.[9] The unique treatment that employers give to bargaining unit members is, of course, reflected best by the collective bargaining agreement. This agreement represents a culmination of often-extensive "give-and-take" negotiations between the employer and the employees' designated bargaining representative. An employer's decision to pay severance or any other benefits cannot be understood without inquiring into the substance of such negotiations. In many cases, the inclusion of certain provisions into the collective bargaining agreement additionally requires inquiry into the negotiations between other employers and other collective bargaining units in the industry.

Aside from the collective bargaining agreement itself, a number of other elements of the collective bargaining process reflect the unique treatment accorded to union members. The ability of an employer to modify the collective bargaining agreement, for example, is greatly restricted whenever the proposed modification involves "wages, hours, and other terms and conditions of employment." 29 U.S.C.

7. The Complaint does not allege that the defendants denied the plaintiffs severance benefits in violation of the collective bargaining agreement. In fact, as noted in footnote 1 above, the collective bargaining agreement provided that severance benefits would be paid to bargaining unit members under certain defined conditions, none of which apparently applied to the plaintiffs.

8. The plaintiffs cite several cases as precedent for their theory of recovery. None, however, involve claims of discrimination based on dissimilar treatment of bargaining unit and non-bargaining unit employees. *Danner v. Phillips Petroleum Co.*, 447 F.2d 159 (5th Cir.1971), cited by the plaintiffs, provides little assistance. In *Danner*, the employer defended its decision not to give seniority and bidding rights to clerical employees on the grounds that clerical jobs were not "unionized" jobs. According to the

employer, other employees such as utility men were considered "unionized" (although they were not actually union members) and therefore were entitled to these privileges. The Fifth Circuit rejected this defense as pretextual and, citing the dissimilar treatment of female clerical workers and male "unionized" employees, held in favor of the plaintiff. The court did *not* compare the employer's relative treatment of union and non-union employees.

9. Although the parties are unable to cite any cases for or against this exact proposition, the court in its own research has located two analogous cases which indicate that union and non-union employees are not similarly situated for purposes of class membership under Fed.R.Civ. P. 23. *See Wells v. Ramsay, Scarlett & Company, Inc.*, 506 F.2d 436 (5th Cir.1975); *Cooper v. Florida Power & Light Co.*, 18 FEP Cases 319, 321 (M.D.Fla.1978).

§ 158(d). Under the NLRA, 29 U.S.C. § 158(a)(5), an employer has the duty to bargain over such "mandatory" subjects. *Clear Pine Mouldings, Inc. v. N.L.R.B.*, 632 F.2d 721 (9th Cir.), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981). Thus, while a sudden upturn in profits may stimulate an employer to spontaneously offer bonuses to his employees performing under individual contracts, that employer would be obligated to bargain with a designated bargaining representative over any bonus payments to union employees. The size and strength of the designated bargaining representative may further limit the conduct, or potential conduct, of the employer.

The plaintiffs in the present case seek the opportunity to demonstrate that the defendants were motivated by race or color in making payment of severance benefits, not by the contractual status of the various employees. However, the plaintiffs cannot negate the existence of the collective bargaining agreement. Although the plaintiffs may be able to show that the employer gave to non-bargaining unit members all of the *tangible* benefits that were given to bargaining unit members, *see* Complaint at 6, they will not be able to show that the employer's decisions regarding non-bargaining unit members were restricted by the many *intangible* considerations inherent in collective bargaining.

A second reason for our affirmance of the dismissal of Count One is the federal policy of judicial nonintervention in the collective bargaining process. As noted earlier, employers' and unions' faith in the ability of the collective bargaining process to provide solutions to problems in labor relations greatly depends on such nonintervention. A policy of refusing to enforce collective bargaining agreements and of imposing contractual modifications on parties to such agreements would drastically reduce the incentive of those parties to work toward negotiated solutions. Under such a policy, parties to and agreement would face the potential of their opposition turning to the courts for assistance in accomplishing goals not achieved at the negotiating table. Such a result would be contrary to the well-established federal policy goal of fostering collective bargaining as the means of resolving employer-union disputes.

■ The federal policy of judicial nonintervention in the collective bargaining process must of course give way to the federal policy, embodied in Title VII, of eliminating racially-discriminatory employment practices. Thus, the courts have held that Title VII imposes an affirmative duty on employers to modify collective bargaining agreements which are discriminatory in their application. *See, e.g., United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir.1971). This exception to the policy of nonintervention has not been extended, however, to cases where the product of the collective bargaining process is a nondiscriminatory agreement. Under such circumstances, the policies of Title VII are not implicated to the extent necessary to override federal labor policy.

A final reason for refusing to accommodate the plaintiffs' request for a modification of the collective bargaining agreement in this case is that minority union members will not be without a remedy as a result of this refusal. If minority union members are dissatisfied with the terms of their collective bargaining agreement, they have the option of electing a new bargaining representative or leaving the union altogether. If they choose the latter option, Title VII will provide them with a potential remedy whenever their employer offers similarly-situated non-minority members more favorable treatment.

When minority union members choose collective bargaining as a means of remedying unfavorable employment conditions, they sacrifice any right to complain of more favorable treatment of non-union employees. Collective bargaining provides many benefits and protections that are unavailable to non-union members; however, assurance of equal treatment with those who elect not to utilize the collective process is not one of those protections. By electing a collective bargaining representative, minority workers accept the responsibility of adhering to the terms of any non-

discriminatory agreement negotiated in good faith by that representative.

## II. Count Two: Refusal to Hire

In Count Two of the Complaint, the plaintiffs allege that "management perpetuated a policy that was discriminatory [sic] in that positions ineligible for union membership, such as clerical employees, mechanics, watchmen, office janitors and jobs [sic] were all occupied by whites, but are not considered traditional management positions." They further allege that such employees "were granted the same benefits that union members received as a result of the union's negotiations, such as holidays and birthdays off," but that "union members were not granted the same benefits that non union/non-bargaining unit employees received, such as time off to attend funerals with pay and severance pay."

At first glance, Count Two appears to challenge the dissimilar treatment of non-union employees to establish Title VII discrimination against union members. As explained in the previous section of this Opinion, such a challenge does not state a claim of Title VII discrimination.

Our inquiry into the allegations of Count Two does not end there, however. In reviewing a dismissal for failure to state a claim, we are obligated to construe the complaint in a light most favorable to the plaintiffs and assume all allegations to be true. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Construing Count Two in a light most favorable to the plaintiffs, we find that plaintiffs seek to prove that the positions held by non-union members were denied to them in violation of Title VII. Under this interpretation of Count Two, the plaintiffs would establish racial discrimination by showing that the defendants chose non-minority members over minorities in filling the more favorable non-union jobs. Our analysis of the denial of severance benefits challenged in Count One does not preclude the plaintiffs from pursuing this refusal-to-hire theory.

In dismissing the plaintiffs' complaint, the district court stated that 29 U.S.C. § 158(a)(5) required the employer to deny severance benefits to the plaintiffs pursuant to the terms of the collective bargaining agreement. The court apparently believed that the plaintiffs were challenging the denial of severance benefits in all of their counts. Because we read Count Two as setting forth a theory separate and apart from that which was set forth in Count One, we reverse. On remand, the district court should provide the plaintiffs with an opportunity to better articulate their refusal-to-hire theory in an amended complaint.

## III. Equal Pay Act Claim

While we do not agree that § 8(a)(5) of the NLRA precludes the plaintiffs' second Title VII claim, we do agree with the trial court's decision to dismiss the Equal Pay Act claim for relief. The Equal Pay Act applies to disparities in pay between male and female employees. Not only does the complaint fail to allege any differences in pay or benefits based on gender, it fails even to assert the gender of the plaintiffs, of other members of the class that the plaintiffs purport to represent, or of the non-union employees who received severance pay. In short, the complaint makes no reference to gender whatsoever. Under these circumstances, the district court correctly concluded that the plaintiffs' allegations in this regard are not sufficient.

For the foregoing reasons, the district court's dismissal of Count One of the complaint is AFFIRMED; the district court's dismissal of Count Two of the complaint is REVERSED; the district court's dismissal of the complaint against Western Grain for insufficiency of service of process is VACATED; the district court's dismissal of Count Three of the complaint is AFFIRMED; and the case is REMANDED for further proceedings not inconsistent with this opinion.