[Cite as *Gast v. Martins Ferry*, 2019-Ohio-1147.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

CHARLI GAST, ET AL.,

Plaintiffs-Appellants,

v.

CITY OF MARTINS FERRY, OHIO,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 BE 0024**

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 2017 CV 130

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed

---

*Atty. F. Benjamin Riek III,* Law Offices of F. Benjamin Riek III, 755 White Pond Drive, Suite 403, Akron, Ohio 44320, for Plaintiff- Appellants and

*Atty. Mel Lute Jr.*, and *Atty. Andrea Ziarko*, Baker, Dublikar, Beck, Wiley & Mathews, 400 South Main Street, North Canton, Ohio 44720, for Defendant-Appellee.

Dated: March 28, 2019

_____

**D'APOLITO, J.**

{¶1} Appellants Charli Gast and Mary Mansfield appeal the judgment entry of the Belmont County Court of Common Pleas granting the motion for summary judgment filed by Appellee City of Martins Ferry, Ohio in this gender discrimination action. Appellants were terminated from their at-will, part-time positions as emergency medical technicians ("EMTs") after a newly-certified EMT, 19-year-old Brianna Schramm submitted a written incident report alleging that they had harassed her for improperly performing her duties.

{¶2} Appellants argue that the trial court erred by crediting disputed testimony at the summary judgment stage, and in finding that union member and full-time Paramedic Jeff Johnson was not a similarly-situated male employee. Because we agree that Johnson is not a proper comparator based upon uncontroverted evidence in the record, the judgment entry of the trial court is affirmed.

## Standard of Review

{¶3} An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

Case No. 18 BE 0024

> "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor.

*Doe v. Skaggs*, 7th Dist. No. 18 BE 0005, ¶ 11.

## **Law**

{¶4} R.C. 4112.02(A) provides it is unlawful for any employer based on sex "to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Appellants have proffered circumstantial evidence of gender discrimination, so we analyze their claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Janiszewski v. Belmont Career Ctr.*, 7th Dist. No. 16 BE 0009, 2017-Ohio-855, 86 N.E.3d 613, ¶ 18, appeal not allowed, 151 Ohio St.3d 1454, 2017-Ohio-8842, 87 N.E.3d 222, ¶ 18 (2017) citing *Mauzy v. Kelly Services, Inc.*, 75 Ohio St.3d 578, 582, 664 N.E.2d 1272 (1996) (applying federal burden shifting test to state discrimination claims).

{¶5} Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of gender discrimination by a preponderance of the evidence. *Id.* Next, the defendant bears the burden of production to articulate some legitimate, non-discriminatory reason for its actions. *Id.* Lastly, the plaintiff must show

that the defendant's proffered reason was not the real reason behind the employment decision, but a pretext for gender discrimination. *Id.*

**{¶6}** To establish a prima facie case of discrimination, a plaintiff must show:  (1) that he or she is a member of a protected group; (2) that he or she was subject to an adverse employment decision; (3) that he or she was qualified for the position; and (4) that he or she was treated differently than similarly-situated individuals. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir.1992).  Appellee concedes that Appellants have established the first three elements of their prima facie case.

**{¶7}** To be similarly situated, the Mitchell Court held "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 583.  Later, in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998), the Court recognized that, although the foregoing considerations are generally relevant, "[c]ourts should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich* at 352.

**{¶8}** In *Perry v. McGinnis*, 209 F.3d 597 (6th Cir.2000), the Sixth Circuit clarified that the *Ercergovich* comparison did not demand "exact correlation," but, instead, "relevant similarity."  *Id.* at 601.  The Court most recently recognized that differences in job title, experience, and disciplinary history may establish that a comparator is not similarly situated.  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir.2016).

### Employee Handbook

**{¶9}** Appellees' employee handbook defines "harassment" as "any conduct that has the effect of unreasonably interfering with an individual's work performance, creating an intimidating, hostile or offensive work environment, or otherwise adversely affecting an individual's employment."  Examples of harassment include "intimidating or hostile acts (including 'jokes' or 'pranks')" and "different or demeaning treatment." "Harassment" was further defined as "[v]erbal, physical or visual conduct of a racial, ethnic or other types [sic] which impairs an employee's ability to perform their job."  The handbook reads,

"Failure to report any type of harassment will be considered by management to indicate an acceptable relationship or that incidents do not create unreasonable working conditions." (Handbook 57).

{¶10} Under the heading "Progressive Discipline," the employee handbook reads, in pertinent part:

> [Appellee] recognizes that there are certain types of employee problems that are serious enough to justify either a suspension, or in extreme situations, termination of employment without going through the usual progressive discipline steps.
>
> By using progressive discipline we hope that most employee problems are corrected at an early stage, benefitting both the employee and Martins Ferry.

The employee handbook further acknowledges that "[e]ach disciplinary action will be documented by the superintendent and this documentation will be placed in the employee's personnel file." (*Id.* at 60).

## Facts

{¶11} Appellants were part-time, at-will employees of Appellees' Emergency Medical Service ("EMS"). Gast was employed by Appellee for approximately seven years and Mansfield was employed for approximately one year. Appellants held Level one or Basic EMT certification, known as EMT-B, and were licensed to respond to emergency calls. Despite their part-time status, Appellants typically worked 40-50 hours per week in 2015.

{¶12} EMS Coordinator, David Snyder, who had been in the field with Appellants many times, described them as "very competent EMTs." (Snyder Depo. 34). EMS Captain, Brian Cooper described Appellants as "sticklers" with regard to procedures and maximizing patient care.

{¶13} Cooper testified that both women had personnel issues within the department, but conceded "that goes through all EMS. You might look at somebody the

wrong way and somebody takes offense at that." (Cooper Depo. 21). He identified Nick Jessee, James Tolbert, and a few women that were no longer employed by EMS as employees who stated they did not want to work with Appellants. According to a letter requesting reemployment after Appellants' employment had been terminated, EMT Miranda Landers wrote that she had resigned because Mansfield harassed her and told her to quit when they worked together.

{¶14} Cooper testified that he disregarded the complaints about Appellants as hearsay because the complaining EMTs refused to document their issues in writing. The term "hearsay" is derived from a conversation Cooper had with Mayor Paul Riethmiller, who appointed Snyder and Cooper to their supervisory positions at EMS. Riethmiller explained that any complaints regarding personnel should be reduced to writing, insofar as he was unable to rely on hearsay when considering personnel decisions.

{¶15} Appellants' prior disciplinary history is in dispute. According to Cooper, he had called Appellants to his office four or five times in the past because other EMTs said they were "too mean, this, that, and the other thing." (Cooper Depo. 83-84). Cooper testified that, in these meetings, Appellants acknowledged that they were "aggressive," "that's how they do things and other people need to get thicker skins," and "In EMS. That's how we go." (*Id.* at 84). Cooper further testified that Mansfield could get mean if she was provoked.

{¶16} In an affidavit attached to the motion for summary judgment, Cooper averred that "[o]n multiple occasions it was brought to [his] attention that [Appellants] had belittled, harassed, intimidated, and/or bullied co-workers." (Cooper Aff. ¶ 5). At his deposition, Cooper testified that he did not prepare the affidavit, and that he did not agree with the term "harassed." (*Id.* at 102).

{¶17} At their depositions, Appellants testified that they had each been reprimanded one time by Cooper. Mansfield testified that she was called into Cooper's office on one occasion and told to "watch what you say, don't joke around because people may not take it as a joke." (Mansfield Depo. 59). She testified that the reprimand was not related to any particular incident. Likewise, Gast testified that she was verbally reprimanded one time. She was called into Cooper's office because of an accusation by EMT-B Kaitlyn Copeland that Gast had threatened her on Facebook. Gast explained that

she saw Copeland driving an ambulance with a flat tire and recounted the story at Gast's other job.

{¶18} Appellants concede there was a long-standing hierarchy of personnel at EMS. At the top were the paramedics, who were the most highly-trained members of the staff. Next were the EMT-Is, or intermediate level EMTs, with the EMT-Bs at the lowest level comprising the majority of EMS.

{¶19} By tradition, the more senior EMTs helped train the new hires in the procedures and practices of EMS. New EMTs were required to demonstrate they knew where all the equipment was located, how to use it, and how to insure the equipment was ready for use. In order to confirm the newer EMTs were qualified, more senior EMTs worked individually with them on the various jobs that had to be mastered.

{¶20} To verify proper training, new EMTs performed various tasks in the presence of the more senior staff. When an EMT failed to grasp a particular responsibility, the more senior staff would retrain them. Appellants testified that retraining occasionally included kidding and comments about the new EMTs abilities. Appellants were subject to this tradition when they were first hired until they established their own proficiency.

{¶21} On October 1, 2015, the day that is the subject of Schramm's incident report, Appellants were scheduled to work a shift with Johnson and Schramm. Mansfield, Johnson, and Schramm provided conflicting accounts of the day.

{¶22} Mansfield testified that, when she arrived that day, she found Schramm using a checklist to oversee each of the squads (ambulances) and their equipment. Mansfield noticed that Schramm had failed to check some of the fluid levels in a squad and offered to assist her. Mansfield asked to review Schramm's list to determine the tasks Schramm had already completed.

{¶23} Mansfield asked Schramm if she had checked the cardiac monitors contained in some of the squads. Schramm indicated that one of the batteries was low, but she did not know how to exchange the battery for a fully-charged unit. Mansfield showed Schramm where the recharger was located and how to change the battery. Mansfield then asked if Schramm knew how to set up the 12 leads on the monitor, and Schramm replied that she did not.

Case No. 18 BE 0024

**{¶24}** By that time, Johnson and Gast had walked over to the squad and were watching the demonstration. Mansfield explained to Schramm that Johnson, who was the full-time paramedic assigned to the shift, preferred the leads to be set up so that the adhesive pads were already on the leads when they were needed. After Mansfield demonstrated the technique, Schramm folded the leads into storage and the four of them left the garage area for the lounge.

**{¶25}** Throughout the rest of that day, the crew members ate their meals together, responded to calls, and folded fundraising shirts for delivery. According to the schedule, Schramm worked with Gast three additional days without issues.

**{¶26}** Johnson provided an undated written account of the events of October 1, 2015. According to Johnson, he noticed that Schramm had not done fluid checks on the motors. When he confronted her, Schramm told him no one had ever performed that task during her prior shifts, despite the fact that the task was on the checklists. Johnson instructed Mansfield to perform the fluid check with Schramm, which prompted Mansfield to review Schramm's prior work that day. Mansfield found a dead or low battery in a monitor, and, according to Johnson, Mansfield informed Schramm "nicely" of her responsibility to monitor and replace or report equipment problems to avoid responsibility for equipment failure on a call.

**{¶27}** Next, Johnson asked Schramm if she had been trained to set up all of the relevant equipment. Schramm responded in the affirmative, but when Johnson asked her to set up the "monitor to transmit 12 lead to Wheeling Hospital," she confessed she was unfamiliar with the process. Mansfield explained that Schramm needed to learn the preferred methods of her paramedics, for instance, that Johnson liked his leads packed in a specific way.

**{¶28}** When the foursome returned to the living room, Johnson asked Schramm who had trained her, and she told him that she was trained by Paramedic Mary Greer. Greer was identified by Snyder at his deposition as EMS's Training Officer. Johnson told Schramm that she was not the first of Greer's trainees who was unaware of certain responsibilities of the job. Johnson explained that Greer relegates her EMT to the role of driver, but that other paramedics expect their EMTs to "be aggressive and jump in and do

what you were trained to do." (Statement 3). The four employees spent the remainder of the shift folding fundraising t-shirts, going on separate calls, and eating lunch together.

**{¶29}** It was not until October 9, 2015 that Schramm discussed the events of October 1st with Greer. Greer informed Cooper, and Cooper instructed Greer to tell Schramm to submit an incident report. Schramm testified that she was given the form by Cooper and completed it in his office. Schramm's incident report form, dated October 9, 2015 reads, in its entirety:

> On October 1st 2015, I worked with [Jeff Johnson, Charli Gast and Mary Mansfield]. Like every other shift, I started off my day with squad checks at 7 am. Charli Gast was inside with Jeff Johnson talking. I was the only person out in the bay checking squads by myself. I was getting to the last of my squads when Mary Mansfield approached me. She took the clipboards for the squads I just previously checked. She pulled me into one of the squads and started yelling at me about a cardiac monitor battery being low. She was right, because while checking the squad, I forgot to check the monitor battery. She stated that if we were to go on a cardiac arrest and the monitor would die, it would be all my [sic] fault. Mansfield then proceeded to rip the cords out of the cardiac monitor and scold me for "not folding them correctly." She continued to scold me saying that Jeff Johnson prefers his stickers on the 12 leads.
>
> By this time, Mansfield and I were both in the squad, and Charli Gast and Jeff Johnson were standing in the open side doors to the squad. Jeff Johnson being the full timer, stood by while Mansfield scolded me. When Mansfield finished, Jeff Johnson added, "I've already been called into the office because of you." Once Mansfield was finished correcting me on how to properly set up a squad to how Johnson likes it, I went back to the squad I was removed from. Mansfield jumped inside and told me that we were going to start over to make sure I "did it right." Mansfield then began to explain to me

how "aggressive" her and Charli are. Mansfield then said, "I will chew your ass out" referring to me if I would mess anything up or do anything wrong. After that incident, I finished my squad checks and returned inside to the show room to avoid them.

When they came in, they asked me who I had trained with. I rambled off names such as Mary (Greer), Nick Jessee, and a few others I worked with since I first started. They all joined together and said, "There's your problem" and smirked. I tried to isolate myself from them because I feel [sic] threatened. I wanted to be as far away from them as possible. A call came in and Charli and I were the crew to take it. Once on scene, Charli took lead and I followed asking her if she needed anything or if there was anything I could do for her. She ordered me to get the cot, so I did. Once we got the patient loaded and dropped off, we came back to station. Like previously stated, I tried to isolate myself in the show room to avoid confrontation. Charli + Johnson then walked into the room and Charli stated, "I talked to Johnson about the call, we both think you could use some work." I just nodded my head and they walked off.

I felt threatened by all of them. I feel like they were watching my every move, so it felt as if I was walking on egg shells and trying not to mess up because I didn't want any more confrontation from them. I just felt like they were talking about me behind my back. I didn't notify anyone because I was afraid of it coming back on me and if I happened to work with them again, I didn't want them cornering me for telling the entire time I felt like I had to do everything their way and by their standards or else I wasn't good enough.

{¶30} Riethmiller instructed Cooper to gather statements about Appellants and submit them to Snyder. Cooper informed the other employees at EMS that they could

submit statements about their interactions with Appellants. Cooper forwarded the statements of Greer, Jessee, and Tolbert to Snyder who forwarded then to Riethmiller.

**{¶31}** Snyder conceded that he never accessed Appellants' personnel files. In an affidavit attached to the motion for summary judgment, Snyder averred that several informal complaints of harassment, intimidation, and bullying by Appellants had been brought to his attention, most of them by other female EMTs. He further averred that he verbally reprimanded Appellants for their "inappropriate personal conduct" on several occasions. (Snyder Aff. ¶ 4-6).

**{¶32}** Besides Schramm's statement, there was no other written account of the events of October 1, 2015 prior to Appellants' termination. Cooper did not inform Appellants that a complaint had been lodged against them or the nature of the charges. As a result they were not permitted to submit a statement in their defense. In fact, neither Appellant was made aware of Schramm's allegations until the day their employment was terminated. Riethmiller testified that he expected to hear Appellants' version of the story during their pre-disciplinary meetings.

**{¶33}** Cooper testified that Riethmiller instructed him to meet with Johnson and Johnson's union representative. At the meeting, Johnson said "he did not witness anything go back and forth like that. He could only state that he was there." (Cooper Depo. 61). Cooper communicated the foregoing information to Riethmiller. Cooper conceded that Johnson was not informed of Schramm's accusations at the meeting. According to Johnson, he was not called in to meet with Cooper until after Appellants' employment was terminated.

**{¶34}** Riethmiller believed that performance evaluations were performed in EMS, and that they were Snyder's responsibility. Riethmiller was never informed about employee performance at EMS, however, he conceded that other employees had told him that Appellants were "outstanding" EMTs and "good workers." (Riethmiller Depo. 21-22).

**{¶35}** Riethmiller, Snyder, and Cooper met to discuss Schramm's allegations. Snyder could not recall any discussion from the meeting, but testified that he was not asked to give any recommendation regarding discipline. Snyder was unable to recall whether there was any discussion of Johnson's role in the events of October 1, 2015. At

his deposition, Snyder stated that he thought the harassment involved "some type of physical altercation." (Snyder Depo. 50).

{¶36} Riethmiller testified that Cooper and Snyder reported there was "a situation where a new employee was [sic] claiming harassment and she was to the point she was scared to come to work." (Riethmiller Depo. 46). Riethmiller testified that he believed Johnson was a witness rather than an accused.

{¶37} Riethmiller conducted a second meeting attended by Cooper, Snyder, and Schramm. Reithmiller testified that Schramm said she was grabbed by the arm and pulled into the squad. When asked to describe the harassment reported by Schramm at the meeting, Riethmiller said, "[t]he screaming and yelling about how everything was to be done." (*Id.* at 61-63). Riethmiller testified that Schramm did not mention Johnson's conduct at the meeting.

{¶38} Based on the information gathered at the meetings, Riethmiller concluded that Appellants had violated several provisions of the employee handbook and set forth the charges in Pre-Disciplinary Notices. He then arranged for Cooper to accompany Appellants to City Hall for a meeting.

{¶39} According to Mansfield, she was the first to meet with Riethmiller. Just prior to the meeting, Mansfield received a copy of the Pre-Disciplinary Notice and was made aware of the charges leveled against her. During the meeting, Mansfield denied touching Schramm and all of the other allegations. Riethmiller terminated her employment at the meeting.

{¶40} After Cooper drove Mansfield back to the EMS station, she gathered her personal effects and sent a text message to Gast who was returning from a run. In the text message, Mansfield advised Gast that she had been fired and that Gast was next. According to Gast, upon her return, Cooper drove her to City Hall where she was presented with a Pre-Disciplinary Notice and then terminated by Riethmiller.

{¶41} Reithmiller's recollection of the events surrounding Appellants' termination was completely at odds with Appellants' testimony. Riethmiller testified that he met with Appellants at the same time. He further testified that Appellants were excused after a thirty minute meeting, and that he, Snyder, and Cooper resumed the meeting to determine the appropriate discipline.

**{¶42}** According to Riethmiller, they agreed that "[t]hey had a real problem down at the squad and [they] needed to nip this in the bud and handle it." (Riethmiller Depo. 73). He further stated, "Due to their past write-ups – I want to use the correct word – past disciplinary action, that this needed to be dealt with quickly." (*Id.* at 73-74). Riethmiller testified that "Mr. Cooper had [evidence of predisciplinary action] in their file." (*Id.* at 74). According to his deposition testimony, Riethmiller believed that there were written reprimands in Appellants' personnel files.

## Procedural History

**{¶43}** On February 23, 2016 Appellants filed a two-count complaint in the Belmont County Court of Common Pleas alleging the termination of their employment was motivated by gender discrimination, and they were not considered for open full-time positions for the same reason. The parties exchanged paper discovery but did not conduct depositions prior to the voluntary dismissal of the case.

**{¶44}** The matter was refiled on March 30, 2017. The parties incorporated the written discovery previously exchanged in the original action and scheduled depositions. On January 11, 2018, Appellee filed a Motion for Summary Judgment which Appellants opposed on February 12, 2018. While their motion for summary judgment was pending, Appellants voluntarily dismissed the claim based on the open full-time positions.

**{¶45}** On March 22, 2018 the trial court entered summary judgment in favor of Appellee. The trial court reached the following conclusion with respect to the issues before us on appeal:

> Moreover, Plaintiffs have failed to prove that Johnson was a comparable male employee who received better treatment. Johnson was a full-time employee as a paramedic, the most highly trained of the staff, and thus two (2) levels above Plaintiff's [sic] part time employee level.
>
> Also, Plaintiffs offered no proof of prior disciplinary action against Johnson. Finally, the record is clear that Schramm's complaint of misconduct was only directed at [Appellants] as Schramm named

Johnson as a possible witness rather than a perpetrator. Thus, he is neither comparable to Plaintiffs nor did he receive better treatment for comparable conduct, as there is no allegation of misconduct by Johnson.

(3/22/18 J.E. 3).

## Analysis

{¶46} Appellants advance two assignments of error, one procedural and one substantive, both relating to the trial court's determination that Johnson was not a similarly-situated employee.

## Assignment of Error No 1:

The Trial Court Erred in Finding that Plaintiffs Failed To Established [sic] A Similarly Situated Comparator as Part of Their Prima Facie Case.

{¶47} At his deposition, Johnson testified that he had been a paramedic since 1990. At all times relevant to the complaint, he was a full-time employee licensed in Ohio and West Virginia and a union member. Appellants, on the other hand, were part-time, at-will EMT-Bs. Nonetheless, Appellants contend that the trial court erred in concluding that Johnson was not a similarly-situated individual.

{¶48} First, Appellants argue that they worked 40-plus hours per week prior to the termination of their employment, and, therefore, Johnson's full-time status did not disqualify him as a proper comparator. However, full-time status was not defined solely by hours worked at EMS. As a full-time employee, Johnson received health benefits. Further, full-time employees worked one 24-hour shift and one 16-hour shift per week. Therefore, Appellants' 40-plus hour weekly schedule did equate to full-time status.

{¶49} Next, Appellants argue that both paramedics and EMT-Bs participated in daily chores, and, as a consequence, were treated equally. This argument belies Appellants' testimony that there was a hierarchy at EMS and paramedics were at the top. Mansfield testified that the color-coded schedule at EMS indicated the full-time employee assigned to the shift because "that's how they ran it was who was your full-timer [sic]."

Case No. 18 BE 0024

(Mansfield Depo. 9-10). The full-time employee was responsible for determining the personnel sent on a call. Therefore, paramedics had certain managerial responsibilities that were not shared by the EMTs.

**{¶50}** Further, Johnson was licensed in West Virginia and Ohio. Dual licensing was coveted by EMS based upon its proximity to the state line. Although Gast testified that she was in the process of attaining a West Virginia license, she conceded that she held only an Ohio license when her employment was terminated. (Gast Depo. 7-8). Therefore, Johnson had qualifications that distinguished him from Appellants.

**{¶51}** Of greatest import, Johnson was a union member. Federal courts interpreting Title VII have long held that no discriminatory intent may be inferred from a defendant's decision to treat differently union members and non-union members. See *Milloy v. WBBM–TV, Chicago*, 613 F.Supp.2d 1035, 1037 (N.D.Ill.2009) (the difference between being a union member and a non-union member has "consistently been held to negate the 'similarly situated' test applicable to the essential fourth element of a prima facie case***"); *Johnson v. Pepsi Cola General Bottlers, Inc.*, E.D.Wis No. 04-C-325, 2005 WL 1629895, at * 7 (July 6, 2005) ("Where one employee is a union member, and the other is not, the two employees are not similarly situated for the purposes of satisfying the fourth element of a plaintiff's prima facie case."); *Gaddy v. Philadelphia Housing Authority,* E.D.Pa. No 06-CV-04570, 2008 WL 2928485, at *6 (July 28, 2008) ("Smith is not a similarly situated individual because, unlike Gaddy, he is a union member."); *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1170 (11th Cir.1988), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988)("The law is unequivocal that in a Title VII race discrimination claim, '[f]irst and foremost, because of their unique status in the workplace, bargaining unit employees are never similarly situated with non-bargaining unit employees.'")

**{¶52}** In *Davis v. Ineos ABS (USA) Corp.*, S.D. Ohio No. 09-773, 2011 WL 1114409, a state age discrimination case, the Southern District of Ohio observed:

> The reason for the distinction is clear. An employer must often go through a complex process in order to discipline an employee covered by a collective bargaining agreement which frequently involves grievance and appeal procedures. See, Marshall, 838 F.2d

at 1170-71. At-will employees, by contrast, may be disciplined or discharged for virtually any reason, subject to a few exceptions such as discrimination. Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. Because of this fundamental difference, employees in these two groups are never similarly situated and cannot be compared in Title VII lawsuits to show discrimination. The only employees with whom the plaintiffs could compare themselves would be others not protected by the collective bargaining agreement, but there has been no evidence of this nature.

*Davis* at *4, quoting *McKie v. Miller Brewing Co.*, M.D.Ga. 90-46-ALB/AMERDF 1992 WL 150160, at *4 (March 6, 1992) (internal quotation marks and citations omitted). The same is true here.

{¶53} Because Johnson was a full-time paramedic licensed in Ohio and West Virginia and a union member, we find that Appellants have failed to demonstrate "relevant similarity." *Perry*, supra. At oral argument, counsel for Appellants argued that Appellants' at-will employment status is irrelevant because they have asserted a claim for discrimination. While we agree that an at-will employer may not terminate an employee for a discriminatory reason, we hold today that at-will status is nonetheless a proper consideration when determining whether a plaintiff is similarly-situated with his or her chosen comparator.

{¶54} Accordingly, we find that Appellants have failed to establish the fourth element of their prima facie case and that their first assignment of error is meritless. In reaching this conclusion, we have not considered any of the disputed facts in the record.

## Assignment of Error No. 2:

The Trial Court Erred in Weighing the Credibility Of Certain Witnesses' Testimony at The Summary Judgment Stage.

{¶55} While we agree that the trial court improperly credited controverted evidence when it awarded summary judgment, we find that the trial court could have

reached the same conclusion without any reliance on the disputed facts in the record.  As a consequence, we find that Appellants' second assignment of error is moot.

## Conclusion

{¶56} Because Johnson was not a similarly-situated individual, we find that Appellants have failed to establish a prima facie case of gender discrimination. Accordingly, the judgment entry of the trial court is affirmed.

Donofrio, J., concurs.

Waite, P.J., concurs.

Case No. 18 BE 0024

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**